IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01699-MEH

MELEAHA R. GLAPION,

      Plaintiff,

v.

JULIAN CASTRO, Secretary, U.S. Department of Housing and Urban Development,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court are two motions: Defendant's Motion for Summary Judgment [filed March 31, 2015; docket #106], and Defendant's Motion for Summary Judgment Regarding Plaintiff's Freedom of Information Act ("FOIA") Claim [filed April 21, 2015; docket #108] (the "Motions"). The Motions are fully briefed, and the Court finds that oral argument will not assist in its adjudication of the Motions. Based on the record herein and for the reasons that follow, the Court **grants** the Motions.[1]

## BACKGROUND

### I.    Procedural History

      Plaintiff, proceeding *pro se*, initiated this action on June 18, 2014. Complaint, docket #1. Plaintiff shortly thereafter moved for appointment of pro bono counsel, which U.S. Magistrate Judge

---

[1] Pursuant to 28 U.S.C. § 636(c) and the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges, the parties consented to the jurisdiction of this Court to conduct all proceedings in this civil action. Docket #37.

Boyd Boland, the presiding judge on this case before his retirement and the reassignment to this Court, denied as premature. *See* dockets ##5, 6, 9. After reassignment, both parties consented to magistrate judge jurisdiction. *See* docket #27.

Plaintiff's claims arise from her employment as a Management Analyst for the United States Department of Housing and Urban Development ("HUD") and her removal from that position on March 30, 2012. She alleges her supervisors disciplined her on the basis of her race, color, and sex, and in retaliation for making whistleblowing disclosures. *See* docket #40. Before filing the present action, Plaintiff challenged her removal and discipline through the Merit System Protection Board ("MSPB") and Equal Employment Opportunity ("EEO") procedures. The operative pleading – Plaintiff's Third Amended Title VII Complaint – asserts eight claims for relief; however this Court on February 4, 2015, dismissed the whistleblowing, harmful procedural error, and constitutional claims. *See* docket #94. Thus, Plaintiff's remaining claims under consideration in these Motions are: (1) Title VII discrimination based on race, sex, and color; (2) Title VII hostile work environment; (3) Title VII retaliation; (4) Fair Labor Standards Act ("FLSA") violation; and (5) Freedom of Information Act ("FOIA") violation.

Plaintiff in February 2015, while the Motion to Dismiss was pending, again sought appointment of pro bono counsel from the Civil Pro Bono Panel, which the Court granted. *See* dockets ##93, 95. The Pro Bono Panel appointed counsel on April 16, 2015 [*see* docket #107], but the attorney declined the appointment on May 14, 2015 [*see* docket #122]. Plaintiff then filed a response to the Motions and an accompanying declaration [*see* dockets ##111, 111-1], which the Court struck as they included "more than 500 pages of meandering, repetitive argument and, often, unnecessary prose," ordering Plaintiff to revise and refile her brief, limiting its length, and providing

her guidance on how to focus her arguments to the Motions at hand [*see* docket #121].  Plaintiff

refiled her response on June 12, 2015 [*see* docket #126], which the Court again struck as it failed

"to address directly any of Defendant's more than 300 statements of undisputed facts" and spent "80

pages essentially reiterating her Complaint, leaving the Court with practically no ability to determine

whether there are remaining disputed material facts" [*see* docket #129].  The Court gave explicit

instructions to Plaintiff to respond, cite, organize, and be brief, warning Plaintiff that any deviation

from the Court's order would "result in the Court adopting Defendant's version of the facts as true

in the consideration of the pending Motions."  Docket #129.  The Court also ordered Plaintiff to

provide paper copies of her forthcoming response and accompanying exhibits.  *Id.*

Plaintiff then on August 7, 2015, moved for administrative closure of the case based on

personal and professional challenges.  *See* docket #134.  The Court held a hearing on August 12,

2015, denying that motion but allowing Plaintiff additional time to file her modified response.  *See*

docket #136.  Plaintiff then timely filed her Response (combined for both Motions) on September

6, 2015.  *See* docket #137 (with exhibits at dockets ##138-45, spanning multiple docket entries

because of the many exhibits and the manner in which Plaintiff filed them).  Defendant timely filed

his Reply on September 25, 2015.  Plaintiff requested and the Court allowed a Surreply, which

Plaintiff filed on October 12, 2015.  *See* dockets ##147-49.

## II.    Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to

Plaintiff, who is the non-moving party in this matter.[2]

---

[2]Because of the voluminous record in this case and the ongoing difficulty the Court has
had with Plaintiff's responses, which the Court twice struck for being incomprehensible,
excessive (totaling more than 500 pages), and largely nonresponsive [*see* dockets ##121, 129],
the Court has for ease of factual analysis in this Order adopted the structure and numbering

A.    **Background**

1.      Plaintiff's race is Black American, her color is black, and her sex is female.  Docket #38 at 6.

2.      Plaintiff's only work for the federal government before HUD was as an intern at the Social Security Administration in 1999.  Ex. 1 (Plaintiff's Dist. Ct. Depo.) at 6:10-19.

3.      Plaintiff was hired by HUD as a Federal Career Intern ("FCI") effective April 28, 2008.  Docket #38 at 6.

4.      As an FCI, Plaintiff was assigned two years of training and developmental assignments.  Docket #38 at 6.

5.      When Plaintiff started as an FCI, Plaintiff's "targeted office" was HUD's Region VIII Field Policy and Management ("FPM") office, meaning that at the completion of the two-year FCI program, she would work in the Region VIII FPM Office.  Ex. 2 (Griswold Decl.) ¶ 1.

---

convention presented by Defendant in the Motions.  However, the Court has modified the numbering structure by adding to the end of the findings of fact the Freedom of Information Act claims previously handled separately by Defendant in a separate Motion.  *See* docket #108.

Despite adopting the structure provided by Defendant, the Court notes that it has not simply adopted Defendant's version of the facts without a thorough review of the evidence provided.  The Court has fully considered Plaintiff's last-filed, non-stricken Response [*see* dockets ##137-45] and all of its nearly 200 exhibits.  *See id.*  However, with rare exception, the Court has found the facts as propounded by Defendant to be supported by evidence, while Plaintiff's assertion of denials to their truth are not supported by evidence.

Where Defendant's facts had error, the Court has altered its findings of fact to fit the evidence.  The Court has also considered the 41 additional facts offered by Plaintiff in her Response [*see* docket #137 at 4-8], including what she asserts to be dozens of additional adverse actions, but finds they are unsupported assertions, contain inadmissable hearsay, are improperly cited, do not rise to the level of adverse or materially adverse actions, or are redundant and covered already in the facts as relayed in the Motions.  *See* docket #146-3 (for what the Court's review of the evidence reveals to be a fair and accurate analysis of Plaintiff's additional list of adverse actions).  None of the additional facts change the outcome of the Court's analysis.

Finally, the Court notes that unless otherwise indicated, the citations provided are to exhibits attached to Defendant's Motions.

6.       As an FCI, Plaintiff served "rotations" through various HUD offices, meaning that she worked in a range of program offices for specific periods in order to acquire cross-program knowledge and develop professional skills.  Ex. 2 ¶ 1.

7.       FPM is the direct face of HUD in the communities it serves.  It interacts locally with elected officials to ensure that the policies for which HUD is responsible are implemented.  It is ultimately responsible for all HUD programs in the region.  Ex. 3 (MSPB Hearing Day 1) 223:19-224:1.

8.       The basic duties of HUD's FPM office are to:

(a)      act as a front office to ensure delivery of the 48 basic housing programs for which HUD is charged with providing service;
(b)      provide direct customer service to elected officials;
(c)      provide customer service to recipients of or participants in HUD programs;
(d)      provide customer service to the media and general public;
(e)      provide customer service to internal clients made up of the basic program offices that comprise HUD;
(f)      respond to FOIA requests;
(g)      be responsible for White House and secretarial initiatives;
(h)      be responsible for strategic planning to achieve HUD's goals;
(i)      be responsible for special events; and,
(j)      build consensus with stakeholders, elected officials, and program offices.

Ex. 3 at 10:10-11:7; 12:10-13:22.

9.       FPM is one of HUD's six basic program offices, which also include: Office of Public Housing; Office of Multifamily Housing; Office of Single-Family Housing; Office of Native American Programs, Fair Housing and Equal Opportunity; and Office of Community Planning and Development.  Ex. 3 at 11:1-7.

10.      Plaintiff did not serve any rotations in Multifamily Housing while she was an FCI.  Ex. 3 at 116:23-117:4.

11.      Plaintiff was scheduled for a rotation in Multifamily Housing while an FCI, but that was deferred and never completed because Plaintiff was on a different rotation.  Ex. 4 (MSPB Hearing

Day 2) at 10:5-8.

12.     Plaintiff was converted from an FCI to permanent competitive status on May 9, 2010.

Docket #38 at 6.

13.     Plaintiff's conversion on May 9, 2010, was to the position of Management Analyst, GS-12,

in FPM.  Ex. 6 (Plaintiff SF effective May 9, 2010).

14.     Plaintiff alleges that she should have been converted into a GS-13 position as of the date of

her conversion.  Ex. 1 at 104:10-21.

15.     FPM Management Analysts were given assignments to further FPM's work.  Ex. 3 at 13:24-

14:2.

16.     The people Plaintiff alleges discriminated against her are as follows, based on race (Ex. At

234:23-235:4), color (Ex. 1 at 249:9-15), sex (Ex. 1 at 253:1-8), and retaliation (Ex. 1 at 254:20-

255:1):

> (a)     Rick Garcia, who is the Regional Administrator for HUD Region VIII and
> was appointed by the Obama administration in January 2010, and took the
> oath of office in March 2010 (Ex. 3 at 222: 17-24)
> (b)     Deborah Griswold, Deputy Regional Administrator for HUD Region VIII,
> who served from just after Plaintiff started as an FCI until mid-August 2010
> (Ex. 7 (Griswold Dist. Ct. Dep.) at 13:15-14:4);
> (c)     Dan Gomez, Jr., Deputy Regional Administrator for HUD Region VIII, who
> served from mid-August 2010 until after Plaintiff was removed on March 30,
> 2012 (Ex. 3 at 8:7-13,89:10-17; Plaintiff's Exh. 20 (EEOC transcript) docket
> #145-14);
> (d)     Jane Goin, Public Affairs Officer for HUD Region VIII FPM office from
> before Plaintiff arrived until December 2011, when she retired (Ex. 4 at 51:1-
> 20; Ex. 8 (Dec. 27, 2011 email));
> (e)     Donald Gerrish, Employee and Labor Relations Specialist for HUD Region
> VIII office from  August 30, 2010, until present.  (Ex. 9 (Gerrish Decl.) ¶ 1).

17.     The Region VIII FPM is organized as follows: the Regional Administrator (who is an Obama

administration appointee) supervises the Deputy Regional Administrator; the Deputy Regional

Administrator supervises everyone else in the FPM office; and the Deputy Regional Administrator also supervises Field Office Directors.  Ex. 10 (Garcia Decl.) ¶ 1.

18.     HUD's Region VIII includes Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming.  Ex. 10 ¶ 2.

>    **B.     Discipline**

>        **1)     October 28, 2010 counseling based on email to presidential appointee**

19.     On October 28, 2010, Gomez sent Plaintiff an email "counseling" her regarding an email she sent to Obama-appointee Garcia on October 27, 2010.  Ex. 11 (Oct. 28, 2010 email) (authenticated at Ex. 1 at 174:25-175:11).

20.     Plaintiff's October 27, 2010 email to Garcia stated that she wanted to "provide [Garcia] with just enough information on the subject of homelessness so that [Garcia] could make informed decisions (with accurate/supporting information) while avoiding the temptation of giving misinformation."  Ex. 11.

21.     In the same email, Plaintiff wrote to Garcia, "I need you to become better versed; confident; and comfortable serving as FRICH's [Federal Regional Interagency Council on Homelessness] chair."  Ex. 11.

22.     Gomez believed that Plaintiff's October 27, 2010 email to Garcia chastised Garcia, issued him expectations, and failed to show proper deference to a supervisor.  Ex. 3 at 50:19-21.

23.     Gomez believed that the tone and tact of Plaintiff's October 27, 2010 email to Garcia was inappropriate, specifically Plaintiff's assessment of Garcia's performance and commitment and her implicit accusation of Garcia providing misinformation.  Ex. 11.

24.     Plaintiff has not seen any emails to Garcia in which a HUD employee took a tone with him

similar to what she did in her October 27, 2010 email to him.  Ex. 1 at 179:2-6.

> 2)   **April 4, 2011 official reprimand based on communications with organizer of homelessness conference**

25.   On April 4, 2011, Garcia issued Plaintiff a Notice of Letter of Reprimand following a Notice of Proposal to Suspend for Seven Calendar Days dated February 9, 2011 ("February 2011 Proposal"), and issued by Gomez.  Ex. 12 (authenticated at Ex. 1 at 186:9-16).

26.   The February 2011 Proposal informed Plaintiff that she could submit a written and oral response.  Ex. 12 at 2.

27.   On March 10, 2012, Plaintiff's union representatives submitted Plaintiff's written response and made an oral response to Garcia.  Ex. 12 at 2; Ex. 1 at 186:22-188:8.

28.   In his April 2011 decision, Garcia found that Plaintiff had committed two types of misconduct: (1) directly soliciting a gift, and (2) attempted use of public office for private gain.  Ex. 12.

29.   Garcia made his misconduct decision based on the evidence in the February 2011 Proposal, as well as the written and oral responses Plaintiff provided on March 10, 2011.

30.   Regarding the charges of misconduct, the February 2011 Proposal contained the following evidence.  Ex. 13 (authenticated at Ex. 1 179:12-181:12).

> (a)   A December 6, 2010 email from Plaintiff to Organizer of the 2011 National Conference on Ending Family Homelessness stating: "Newly assigned as U.S. Department of Housing and Urban Development Region VIII's Federal Regional Interagency Counsel on Homelessness ("FRICH") Point of Contact ("POC"), it was in my current event research that I came across information on the 2011 National Conference on Ending Family Homelessness. To that end and per the copied information below, I would like to volunteer."  Ex. 13 at 6.
>
> (b)   The copied information stated that there were "opportunities to volunteer" and that volunteers would "receive complimentary registration."  Ex. 13 at 7.

(c)    A memorandum from HUD's Office of General Counsel ("OGC") as to whether Plaintiff's email violated federal government ethical standards. Ex. 13 at 8.

(d)    HUD's OGC memorandum considered a variety of facts, including that the regular conference registration was $450, Plaintiff considered the conference a training opportunity and would attend during duty hours, and the conference is composed of homelessness advocates and professionals who do business with HUD. Ex. 13 at 8-10.

(e)    HUD's OGC considered whether Plaintiff's actions violated 5 C.F.R. § 2635.202(a)(1), which prohibits a federal employee from soliciting or accepting a gift from a prohibited source or given because of the employee's official position. Ex. 13 at 9.

(f)    HUD's OGC concluded that Plaintiff did violate that provision by requesting a volunteer position in exchange for conference registration. Ex. 13 at 9-10.

(g)    HUD's OGC  further concluded that Plaintiff created an appearance of impropriety, and thus violated the ethical prohibition against using her HUD title to attempt to influence the competitive process used by the conference to select volunteers. Ex. 13 at 10.

(h)    HUD's OGC also stated: "What makes Ms. Glapion's conduct here especially disconcerting is that she received explicit written and oral advice from my office less than [a] month ago on many of the ethics principles relevant here." Ex. 13 at 10.

(i)    HUD OGC memorandum also attached an email and earlier memorandum dated November 19, 2010, to Plaintiff providing her with ethical advice regarding the use of her HUD position for personal gain or to receive preferential treatment, among other things. Ex. 13 at 11-15.

31.    In the February 2011 Proposal, Gomez analyzed the 11 factors (commonly known as the "Douglas factors") as well as HUD's Table of Offenses and Penalties and recommended a seven-day suspension. Ex. 13 at 2-4.

32.    In the April 2011 decision, Garcia also analyzed the Douglas factors and decided to issue a Letter of Reprimand. Ex. 12 at 1-4.

### 3)    June 13, 2011 reprimand based on not completing duties for public event

33.    On June 13, 2011, Goin issued Plaintiff an Official Reprimand for Refusal to Comply with a Proper Order based on Plaintiff's failure to complete assignments Goin gave her on May 4, 2011, and May 8, 2011. Ex. 14 (authenticated at Ex. 1 at 192:3-17).

34.     On May 4, 2011, Goin assigned Plaintiff various tasks related to Garcia being a key note speaker at a public event at Creekside West (which created housing for seniors) to take place on May 11, 2011.  Ex. 14 at 3, 4.

35.     On May 8, 2011, Goin assigned Plaintiff various additional tasks related to the Creekside West event and instructed Plaintiff to complete the tasks by the end of the day on May 9, 2011.  Ex. 14 at 3.

36.     To complete the first two assignments made on May 4, 2011 (to reserve a GSA car and print out driving directions), it would have taken about seven minutes.  Ex. 1 at 199:16-200:4.

37.     Plaintiff worked on May 5, 2011.  Ex. 1 at 205:4-10.

38.     Plaintiff worked a ten-hour day on May 9, 2011.  Ex. 1 at 204:21.

39.     Plaintiff did not complete the tasks assigned by May 10, 2011, and Goin had to stop working on Goin's own assignments to complete the tasks assigned to Plaintiff.  Ex. 4 at 70:14-18.

40.     When Plaintiff returned to work on June 7, 2011, Goin asked Plaintiff why she did not complete the tasks, and Plaintiff responded: "I'm without much further explanation for not completing the assignment below [sic] [COB ["close of business"] on Monday 05/9/11 other than that I wasn't feeling well and overlooked this email you sent me on Sunday 05/08/11.  I apologize for the inconvenience caused. Surely it's not in my norm not to have things completed as instructed and by/before set deadlines."  Ex. 15 (authenticated at Ex. 1 at 205:20-23).

### 4)     October 27, 2011 four-day suspension based on incomplete assignments and improper leave

41.     On October 27, 2011, Garcia issued Plaintiff a four-day suspension ("the October 2011 Decision") following a Notice of Proposal to Suspend for Fourteen Calender Days dated August 15, 2011 ("the August 2011 Proposal") issued by Goin.  Ex. 16 (authenticated at Ex. 1 at 231:20-232:1).

42.     The August 2011 Proposal informed Plaintiff that she could submit a written and oral response.  Ex. 17 (authenticated at P Ex. 1 at 231:11-16).

43.     Regarding the charges of misconduct, the August 2011 Proposal contained the following evidence:

(a)     Goin gave Plaintiff an assignment on July 11, 2011, to update a weekly report, but Plaintiff did not complete it on time, and the work Plaintiff later completed had errors.  Ex. 17 at 1 and 9.

(b)     Goin assigned Plaintiff to complete certain letters, but Plaintiff did not complete them in accordance with the departmental correspondence procedures, and when Goin asked Plaintiff to revise the letter in accordance with those procedures, Plaintiff did not do so.  Ex. 17 at 1-2 and 12-55.

(c)     Goin instructed Plaintiff on June 29, 2011, not to email Pat Hoban-Moore (then a HUD Assistant Deputy Secretary and head of FPM in Washington, D.C.) with requests for sick leave without giving Goin or Garcia the chance to address such requests first.  Ex. 17 at 2 and 10-11.  Yet, on July 21, 2011, Plaintiff emailed Hoban-Moore, among others, telling her that Plaintiff was going out on emergency leave; Plaintiff did not send that email to Goin or Garcia.  Ex. 17 at 2-3 and 10-11.

(d)     On July 12, 2011, Goin and Plaintiff had a meeting to discuss work assignments, and Goin thought Plaintiff was rude.  Ex. 17 at 2-3.

(e)     On July 21, 2011, Plaintiff left work before the end of her work schedule without informing Goin or requesting leave.  Ex. 17 at 3.

44.     In the August 2011 Proposal, Goin analyzed the Douglas factors and recommended a 14-day suspension.  Ex. 17 at 3-6.

45.     On September 25, 2011, Plaintiff provided Garcia with a written and oral response to the August 2011 Proposal.  Ex. 1 at 232:2-11.

46.     In the October 2011 Decision, Garcia found that Plaintiff committed four types of misconduct: (1) refusal to comply with proper order; (2) rude conduct; (3) absent without leave; and (4) failure to follow leave procedures.  Ex. 16 at 1-2.

47.     Garcia made the October 2011 Decision based on the evidence in the August 2011 Proposal as well as the written and oral responses Plaintiff provided on September 25, 2011.  Ex. 16 at 1.

48.     In the October 2011 Decision, Garcia also analyzed the Douglas factors and decided to suspend Plaintiff for four days.  Ex. 16 at 2-5.

49.     In making the October 2011 Decision, Garcia took into account, among other things, that Plaintiff had previously received two Official Reprimands, one on June 13, 2011, for refusal to comply with proper orders, and one on April 4, 2011, for directly soliciting a gift and attempted use of public office for private gain.  Ex. 16 at 2.

<b>5)     March 30, 2012 removal based on refusal of Multifamily rotation, checking out laptop, and rude email</b>

50.     On March 29, 2012, Garcia decided to remove Plaintiff from federal employment ("the March 2011 Removal Decision") following a Notice of Proposed Removal dated February 23, 2012, ("the February 2012 Proposal") issued by Gomez.  Ex. 18 (authenticated at Ex. 1 at 230:3-8).

51.     Regarding the misconduct charges, the February 2012 Proposal contained the following evidence.

    (a)     Emails in January 2012 assigning Plaintiff to complete a rotational assignment to the Denver Multifamily Hub.  Ex. 19 at 8-19.

    (b)     Emails in January 2012 in which Plaintiff refused to comply with the January 2012 rotational assignment order.  Ex. 19 at 13, 16-17.

    (c)     Emails dated January 6, 2012 and January 10, 2012, from Gomez to Plaintiff explaining that he would not offer any official time or authorize use of government equipment outside of Plaintiff's approved work schedule.  Ex. 19 at 22, 26.

    (d)     A request by Plaintiff to Denver OCIO (HUD's IT department) checking out a laptop and aircard to "perform[] work matters over the weekend."  Ex. 19 at 33.

    (e)     On January 31, 2012, Plaintiff emailed Gomez to inform him that she was refusing a rotational assignment with the Denver Multifamily Hub and stating: "If my opposition constitutes you/HUD FPM Management proposing and issuing me yet another adverse action with the charge of 'Refusal to Comply with Proper Order,' then please advise time/date of proposed disciplinary hearing."  Ex. 19 at 17.

52.     The February 2012 Proposal informed Plaintiff that she could submit a written and oral

12

response.  Ex. 19 at 5 (authenticated at Ex. 1 at 213:2-7).

53.     On March 20, 2012, Plaintiff submitted a written response and made an oral response to the February 2012 Proposal.  Ex. 1 at 230:14-20.

54.     In the March 2012 Removal Decision, Garcia found that Plaintiff committed three types of misconduct: (1) refusal to comply with order; (2) failure to follow directives; and (3) rude conduct towards her supervisor.  Ex. 18 at 1-2.

55.     Garcia made the March 2011 Removal Decision based on the evidence in the February 2012 Proposal as well as the written and oral responses Plaintiff provided on March 20, 2012.  Ex. 18 at 1.

56.     Before making his removal decision, Garcia consulted with the Labor and Employee Relations Officer assigned to the region and with the Office of the Regional Counsel.  Ex. 3 at 226:13-16.

### i)      Multifamily Rotation: Reasons for Concern

57.     Gomez ordered Plaintiff to complete a rotational assignment to the Denver Multifamily Hub.  Ex. 1 at 219:8-11.

58.     Plaintiff did not complete a rotational assignment to the Denver Multifamily Hub.  Ex. 1 at 219:23-220:3.

59.     Gomez believed that it was crucial for Management Analysts to have an understanding of all of HUD's program in order to do their jobs, in particular GS-12 Management Analysts; at a minimum, GS-12 Management Analysts should have a general understanding of the basic programs in HUD's six main offices, including Multifamily, because calls to FPM are varied and the White House and Secretary expect FPMs to understand the basics of HUD programs.  Ex. 3 at 14:3-21.

60.     Shortly after Gomez began supervising Plaintiff in November 2011, he had a meeting with Plaintiff and discussed rotations with her. Ex. 3 at 18:21-19:25.

61.     Gomez understood from the meeting that Plaintiff had not had rotations regarding Insured-Mortgage programs, Multifamily Housing, or Single-Family Housing. Ex. 3 at 18:21-19:25.

62.     Garcia thought that the rotational assignment to Plaintiff to Multifamily Housing was appropriate because he believed that it would have expanded her knowledge in one of the largest and key divisions of HUD, Plaintiff had never worked in Multifamily Housing before, and the knowledge obtained there would have been beneficial to her as an FPM employee. Ex. 18 at 1.

63.     Gomez also believed that at the time he assigned Plaintiff to a rotation in Multifamily Housing that the program needed help to reduce a backlog of work. Ex. 3 at 152:3-9.

64.     Multifamily Housing is one of the larger program areas in HUD and works very closely with FPM. Ex. 3 at 307:4-20.

65.     Garcia believed that assigning Plaintiff a rotation in Multifamily Housing was consistent with Plaintiff's job title as Management Analyst. Ex. 3 at 289:17-18.

66.     Plaintiff did not know everything about Multifamily Housing and could have learned more about it by serving the rotation. Ex. 1 at 220:9-14.

### ii)      Laptop: Reasons for Concern

67.     In January 2012, Plaintiff was not approved to telework or to work overtime. Ex. 3 at 45:19-22.

68.     Gomez was concerned about Plaintiff working outside of her work schedule because of agency obligations to pay employees working outside of their work schedules. Ex. 3 at 46:7-10, 48:9-10.

69.     Plaintiff never had any work from FPM that required her to work on the weekend.  Ex. 1 at 227:5-6.

70.     Gomez did not believe that Plaintiff had any reason to check out a laptop to perform work. Ex. 3 at 215:9-11.

71.     Gomez was informed by a HUD Information Technology employee that Plaintiff checked out a laptop and took it home.  Ex. 3 at 43:8-15.

### iii)     Email: Reasons for Concern

72.     Gomez believed that Plaintiff's January 31, 2012 email was rude because he thought that it essentially encouraged and urged him to issue discipline and was a clear, overt challenge.  Ex. 3 at 181:24-182:1.

73.     Garcia believed that Plaintiff's January 31, 2012 email (noted in Fact 51(e) above) was rude because he believed that it taunted the supervisor by saying to bring it on, and that it was inappropriate for any employee to talk to her supervisor that way.  Ex. 3 at 282:7-13.

### 6)     <u>Reasons for Selection of Penalty</u>

74.     In the February 2012 Proposal, Gomez analyzed the Douglas factors and recommended that Plaintiff be removed.  Ex. 19 at 2-5.

75.     In making that recommendation, Gomez considered that in the prior 14 months, Plaintiff had received four disciplines:

(a)     a counseling memorandum on October 28, 2010, for inappropriate conduct and failure to show deference to a Regional Administrator;

(b)     an Official Reprimand on April 4, 2011, for directly soliciting a gift and attempting to use public office for private gain;

(c)     an Official Reprimand on June 13, 2011, for refusal to comply with proper orders; and

(d)     a four-day suspension on October 27, 2011, for refusal to comply with proper order, rude conduct, absent without leave, and failure to follow leave

procedures.

Ex. 19 at 3.

76.    Gomez believed that Plaintiff's misconduct issues showed a pattern with each offense becoming a little more assertive and aggressive and without any demonstrable improvement in performance.  Ex. 3 at 39:22-25.

77.    Gomez proposed removal instead of some other discipline because, in his view, there was no evidence that disciplinary action deterred Plaintiff or that she had any desire of being rehabilitated through her own accord or through any efforts of HUD to provide her opportunities to succeed.  Ex. 3 at 55:10-24.

78.    In his March 2012 Decision, Garcia also analyzed the Douglas factors and decided to remove Plaintiff.  Ex. 18 at 2-5.

79.    In making that decision, Garcia took into account, among other things, the discipline Plaintiff had previously received as detailed in Fact 75 above.  Ex. 18 at 2.

80.    In considering the previous discipline, Garcia would have hoped to have seen levels of change or improvement in conduct that would have allowed a good working relationship to go forward, but Garcia did not think that there was any evidence that the situation was going to improve.  Ex. 3 at 238:9-21.

**III.    Changes in Duties and Supervisors**

81.    The Position Description for Plaintiff's job listed "Major Duties and Responsibilities" including: (a) "(9) Finalizes and ensures distribution of approved press releases and coordinates or assists in the coordination of, related major public affairs activities and outreach events"; and (b) "(16) Perform other job related duties as assigned."  Ex. 22 at 8-9 (authenticated by Ex. 22 ¶ 1).

### A.    Griswold

82.    Griswold did not supervise any other FCI interns when she supervised Plaintiff.  Ex. 4 at 19:20-24.

83.    After Plaintiff converted to the Management Analyst position, her duties included working with reestablishing the Federal Regional Interagency Council on Homelessness ("FRICH"), supporting the Public Affairs Officer ("PAO") with public media press releases and special events, working with the management plan, and working on Congressional and FOIA letters.  Ex. 4 at 26:20-27:11.

84.    When Plaintiff worked for Griswold, Plaintiff received a lot of assignments from Goin.  Ex. 1 at 75:5-21.

85.    Griswold never issued Plaintiff any discipline.  Ex. 4 at 42:24-43:2.

86.    Griswold supervised Plaintiff before Gomez did.  Ex. 1 at 38:18-20.

### B.    Gomez: First Supervision

87.    Gomez first supervised Plaintiff from August 2010 to April 11, 2011.  Ex. 1 at 38:21-25.

88.    Plaintiff's supervision was changed from Griswold to Gomez because Griswold left her position as Deputy Regional Administrator, and Gomez became Acting Deputy Regional Administrator (and later Deputy Regional Administrator) in her place.  Ex. 10  3.

89.    Plaintiff's duties and responsibilities during the first time she was supervised by Gomez were the same she had when she was supervised by Griswold.

### C.    Goin

90.    Goin supervised Plaintiff from April 2011 to November 14, 2011.  Ex. 1 at 39:1-3.

91.    Garcia changed Plaintiff's supervision from Gomez to Goin in April 2011 because Garcia

thought that Goin had a lot of public affairs work to be done, and Plaintiff had previously performed public affairs work under Goin.  Ex. 10  4.

92.     Plaintiff's FRICH duties were reassigned following the April 4, 2011 Discipline regarding her inappropriate solicitation of free registration at a homelessness conference, because Gomez did not think that she could be trusted with the homelessness responsibilities from that point forward. Ex. 3 at 132:25-133:16.

93.     When Plaintiff was assigned to Goin, Goin recalled having enough work for two to four people.  Ex. 4 at 58:3-13.

94.     Goin complimented Plaintiff on Plaintiff's work.  Ex. 5 at 63:9-11, 21-22.

95.     Goin did not supervise anyone else during the time Goin supervised Plaintiff.  Ex. 1 at 40:6-8.

96.     Plaintiff's work while supervised by Goin included press pitch calls, press releases, public event summaries, transcribing speeches by Garcia and Gomez, and postings on public web sites. Ex. 1 at 80:8-16.

97.     Plaintiff wrote in an email to Goin on April 26, 2011: "I find your management style to be not only that of a 'micro-manager' but overly excessive and belittling . . . This is a shared view of not only myself but others' [sic] . . . ."  Ex. 20 (authenticated at Ex. 1 at 164:4-7).

98.     Plaintiff saw Goin being a micromanager towards other people too.  Ex. T at 164:21-23.

99.     Plaintiff wrote in a July 21, 2011 email that "PAO Goin constantly criticizes, demeans, and undermines me as her subordinate and seeks to delight in overworking and exploiting."  Ex. 17 at 10-11.

100.    On September 28, 2011, Plaintiff sent an email to Goin (and cc'ed others) in which she

wrote, among other things: "PS-Nicole Baca and Jim Graver have both stated on numerous accounts [sic] that pictures you've taken were always of poor quality; thus I don't expect to learn photography skills from you." Ex. 21 (authenticated at Ex. 1 at 172:8-16).

101.    Plaintiff's public affairs duties were reassigned on October 20, 2011, and Plaintiff was reassigned as a back-up for Sylvia Cabrera. Ex. 1 at 86:16-20.

### D.    Gomez: Second Supervision

102.    Gomez supervised Plaintiff again from November 14, 2011, to March 30, 2012. Ex. 1 at 39:4-7.

103.    Garcia changed Plaintiff's supervision from Goin to Gomez in November 2011 because he did not think that Plaintiff got along with Goin, and there was work in FPM to be done that had been under Gomez's supervision. Ex. 10 ¶ 5.

104.    The duties Gomez assigned to Plaintiff on October 20, 2011, were new duties to Plaintiff. Ex. 3 at 152:23-25.

105.    Gomez assigned those duties to Plaintiff to provide work assignments, and because he generally tried to have a back-up staff person listed to cover duties when the primary employee was out of the office. Ex. 22 ¶ 3.

106.    Gomez believed that the duties he assigned to Plaintiff were appropriate given her position description. Ex. 22 ¶ 4.

107.    During her second supervision by Gomez, he assigned Plaintiff duties regarding the Combined Federal Campaign ("CFC") (a program encouraging federal employees to donate to charities), the Civil Rights Division, and the Olmstead Housing Initiative. Ex. 1 at 88:3-22.

108.    Plaintiff exercised discretion and independent judgment to perform the work Gomez

assigned, and that work involved matters of significance to the agency.  Ex. 1 at 89:2-8.

## IV.    Other Employment Matters

### A.    February 26, 2010 Comments by Jane Goin

109.    On February 26, 2010, Goin made comments to Plaintiff that Plaintiff believes were discriminatory on the basis of race and sex.  Ex. 1 at 159:25-160:22.

110.    On that date, Goin introduced Plaintiff to a Black American man visiting the office with then-Mayor Hickenlooper by saying "[H]ey, have you met Meleaha, you have five minutes to get her phone number, ha-ha-ha, she's a cutie isn't she," and Goin coming back and saying "[W]ell did you get Meleaha's number, I wasn't kidding, your loss."  Ex. 1 at 159:25-160:9-23.

111.    On April 1, 2010, Plaintiff wrote to Griswold that "Ms. Goin personally provided me an explanation and sincere apology for a comment which she inadvertently made on 02/26/10 which I felt was inappropriate.  It was with the utmost professionalism, respect and fairness that Ms. Goin and I talked openly and came to an understanding.  I regret not having gone to Ms. Goin directly; as she's been very supportive of my career development here in FPM/HUD."  Ex. 23 (authenticated at Ex. 1 at 159:9-13).

### B.    February 2010 GS-13 Position

112.    Plaintiff alleges that she was discriminated against regarding the Senior Management Analyst GS-13 position that Effie Russell was hired into because Plaintiff was obstructed from competing for that position.  Ex. 1 at 130:25-131:13.

113.    Plaintiff alleges that she was obstructed because she did not receive any announcement for that GS-13 position.  Ex. 1 at 131:14-22.

114.    The GS-13 position was advertised in August 2009.  Ex. 7 at 39:15-25.

115.   Griswold forwarded the position announcement to FPM staff.  Ex. 7 at 39:24-40:4.

116.   Griswold did not forward that position announcement to Plaintiff because Plaintiff was not working in FPM at the time.  Ex. 7 at 40:14-18.

117.   Russell started as Senior Management Analyst, GS-13, in February 2010.  Ex. 4 at 211:23-25.

### C.    2010 Blacks in Government Conference

118.   Griswold tried to get funding for Plaintiff to attend the Blacks in Government ("BIG") conference in 2009 and supported Plaintiff attending the BIG conference in 2010.  Griswold, MSPB Day 2, 46:3-13.

119.   The 2010 BIG conference was held August 16-20, 2010.  Ex. 24.

120.   Plaintiff attended the 2010 BIG conference.  Ex. 1 at 68:8-13.

121.   Gomez believed that Plaintiff's airfare to and from the 2010 BIG conference was purchased using government contract fees.  Ex. 22 ¶ 5.

122.   On August 18, 2010, Plaintiff sent an email to Griswold and Garcia that stated that Plaintiff's uncle passed and "please understand my reasons for switching my flight home Saturday to go straight to DC where they are.  The Fed Travel agency changed w/ no difference in price except $7 . . . ."  Ex. 25 (authenticated by Ex. 10 ¶ 6).

123.   On August 19, 2010, Griswold sent Gomez an email that stated:

> Denise Hernandez called Fed Traveler/SATO and confirmed with them a few moments ago that Meleaha Glapion indeed booked a Government Contract Air Fare flight yesterday through SATO for her personal use, for a last minute flight from Kansas City to Washington, D.C., and she paid only $7 for this personal trip.  It appears that she has violated the ethics rules using a government contract for personal gain.

Ex. 26 (authenticated by Ex. 22 ¶ 6).

124.    Gomez believed that Plaintiff had used a government contract fare for personal travel and that she in doing so had violated GSA travel rules . Ex. 3 at 59:5-11.

125.    Plaintiff was not disciplined regarding her flight from Kansas City for the 2010 BIG conference. Ex. 22 ¶ 7.

### D.    Student Loan Repayment Program ("SLRP")

#### 1)    Russell's 2010 SLRP Application

126.    Griswold received Russell's 2010 SLRP application on August 11, 2010. Ex. 7 at 55:17-21.

127.    The SLRP application included a section, "Recommendation to Offer Student Loan Repayment." Ex. 27 at 4-6 (authenticated at Ex. 1 117:3-7).

128.    That section included a space for the recommending official to include a statement to justify approval of the application. Ex. 27 at 5-6.

129.    When Russell sent Griswold her 2010 SLRP application, Russell also sent her a draft of the required statement of recommendation from the supervisor. Ex. 7 at 55:22-25.

130.    Griswold found the draft statement tremendously helpful because she could quickly revise and edit it to complete Russell's SLRP application. Ex. 7 at 56:14-23.

131.    On the same day that Russell send Griswold her 2010 SLRP application, Russell also told Griswold that she had sent Griswold an email about her SLRP application. Ex. 7 at 56:4-13.

#### 2)    Plaintiff's 2010 SLRP Application

132.    On August 12, 2010, Plaintiff sent notification by email to Griswold that Plaintiff had applied to the SLRP. Ex. 28 (authenticated at Ex. 1 at 115:10-12).

133.    Prior to that August 12, 2010 email, Plaintiff had not had any discussions with Griswold about SLRP. Ex. 1 at 115:13-15.

134.    Griswold did not open Plaintiff's email about the SLRP application until August 16, 2010, because Griswold was in the midst of transitioning to a new position and she got 300 to 400 emails a day .  Ex. 7 at 60:11-61:2.

135.    Griswold was no longer the Deputy Regional Administrator on August 16, 2010, when she opened Plaintiff's email about her 2010 SLRP application, so Griswold believed she did not have the authority to act on Plaintiff's 2010 SLRP application.  Ex. 7 at 61:7-11.

136.    Plaintiff did not send Griswold any instructions as to what Griswold was to do about Plaintiff's SLRP application.  Ex. 1 at 116:3-5.

137.    Plaintiff did not send Griswold a draft of what Griswold could insert in the supervisor approval section or provide any other information.  Ex. 7 at 61:12-16.

138.    Plaintiff did not have any follow up communications with Griswold about her SLRP application.  Ex. 1 at 116:19-20.

139.    Gomez was the acting Deputy regional Administrator on August 16, 2010.  Ex. 29 at 13:8-10.

140.    Plaintiff did not tell Gomez what he had to do to complete Plaintiff's 2010 SLRP application. Ex. 1 at 121:6.

141.    Plaintiff did not tell Garcia what Gomez or Griswold had to do to complete Plaintiff's 2010 SLRP application.  Ex. 1 at 124:6.

142.    Following his appointment as acting Deputy Regional Administrator, Gomez initially believed that Griswold would handle Plaintiff's 2010 SLRP application.  Ex. 30 at 243.

143.    As of August 2010, Gomez had never before had to deal with an SLRP application and had not been instructed what to do with such an SLRP application.  Ex. 22 at ¶ 30.

144.     Gomez only learned about dealing with SLRP applications through dealing with Plaintiff's. Ex. 22 at ¶ 31.

145.     Gomez did not have computer access to Plaintiff's 2010 SLRP application until September 2010.  Ex. 30 at 243.

146.     Once Gomez was instructed by HUD Headquarters about how to complete the supervisor's portion of the 2010 SLRP application, and HUD Headquarters answered his questions about his qualification to do so, Gomez filled in the supervisor's portion, completing his involvement with the processing of Plaintiff's 2010 SLRP application.  Ex. 22 at ¶ 32.

147.     Plaintiff's 2010 SLRP application was approved.  Ex. 27 at 6-8.

148.     Plaintiff was paid $6,642.78 gross for her 2010 SLRP application.  Ex. 1 at 117:21-118:3; Ex. 27 at 8.

149.     Plaintiff does not believe that she would have been paid more in SLRP funding in 2010 but for discrimination, and, thus, has no monetary damages relating to this claim.  Ex. 1 at 118:5-9.

**3)     Plaintiff's 2011 SLRP Application**

150.     Plaintiff also applied for and was paid SLRP funds in 2011.  Ex. 31 (authenticated at Ex. 1 at 124:11-13).

151.     Plaintiff completed her 2011 SLRP application on September 13, 2011.  Ex. 1 at 128:2-8.

152.     Goin completed the supervisor's portion of Plaintiff's 2011 SLRP application on September 16, 2011.  Ex. 1 at 128:2-8.

153.     Plaintiff does not believe the amount paid in SLRP funds in 2011 was affected by discrimination.  Ex. 1 at 127:4-6.

**E.     Draft Performance Review**

154. On Saturday, July 16, 2011, at about 2:00 a.m., in her office's printer room, Plaintiff found a document with a header indicating it was from Goin to Gerrish with the subject line, "As promised – summary performance review" ("Draft Summary").  Ex. 32 (authenticated at Ex. 1 at 208:12-17.)

155. Plaintiff was with her best friend, a non-HUD employee, who was not authorized to be in the HUD office at 2:00 a.m. on a Saturday morning.  Ex. 1 at 209:20-211:2.

156. Plaintiff's friend is the only other person who Plaintiff knows saw the Draft Summary.  Ex. 1 at 209:20-25, 210:7-8.

157. Plaintiff took the Draft Summary and returned it to Goin.  Ex. 1 at 210:10-14.

158. Plaintiff does not know how long the Draft Summary had been in the printer room or who printed it.  Ex. 1 at 210:18.

159. The Draft Summary listed five elements and stated that Plaintiff was fully successful on four and unacceptable on one.  Ex. 32.

160. The performance review Plaintiff received for the period from April 1, 2011, to September 30, 2011, rated her as fully successful in all five elements.  Ex. 1 at 212:18-22.

161. That performance review did not rate her as unacceptable in any element.  Ex. 1 at 70:3-7.

**F.  Telework**

162. Plaintiff made three telework requests, one to Griswold and two to Gomez.  Ex. 1 at 70:3-7.

163. Plaintiff did not submit a telework request to Goin.  Ex. 1 at 70:1-2.

**1)  Telework Request to Griswold**

164. Griswold denied Plaintiff's telework request on June 7, 2010.  Ex. 2 at ¶ 3.

**2)  Telework Request to Gomez**

165. Gomez did not approve Plaintiff's initial telework request made to him because it is his

policy that, when an employee is assigned to him who is not on telework, Gomez works with that employee for 90 days to see how he or she performs.  Ex. 3 at 177:16-21.

166.    Gomez had this policy so that he could have time to evaluate whether an employee's type of work was one that could be done as telework, to decide if the amount of work justified telework, and to determine if the employee was responsible enough to telework.  Ex. 22 ¶ 9.

167.    Gomez applied this policy to other employees.  Ex. 22 ¶ 10.

168.    At the time of Plaintiff's first telework request to Gomez, Plaintiff had not yet worked 90 days for him.  Ex. 22 ¶ 11.

169.    Gomez later met with Plaintiff in January 2011 to discuss telework and asked her to show that she had ten hours of reasonable work to perform while on telework status.  Ex. 3 at 183:6-25.

170.    Ten hours was Plaintiff's normal compressed work schedule ("CWS") work day, so Gomez believed that without 10 hours of reasonable work to fill that day, an employee would not be able to work a full day teleworking and time would be wasted.  Ex. 22 ¶ 13.

171.    Gomez did not approve Plaintiff's telework request because Plaintiff did not show him that she had 10 hours of reasonable work to perform on telework status.  Ex. 22 ¶ 12.

### G.    FMLA

172.    Plaintiff was the only employee in Denver's FPM who used FMLA, except possibly Hernandez, who was approved to use it by Griswold.  Ex. 1 at 50:5-6 (note correction on errata page).

173.    Only one of Plaintiff's FMLA requests, which was for five or six hours, was denied.  Ex. 1 at 51:15-52:12.

174.    Gomez denied the one unsuccessful FMLA request.  Ex. 1 at 52:3-4.

175.	Plaintiff spoke with Gerrish about it and resubmitted the request for FMLA, which was then approved.  Ex. 1 at 52:4-53:1.

### H.	Vacation Time

176.	Plaintiff never made a request for vacation time that was denied.  Ex. 1 at 53:13-19.

### I.	Compressed Work Schedule ("CWS")

177.	Plaintiff believes that she was discriminated against regarding a CWS while she was an intern.  Ex. 1 at 57:5-10.

178.	Plaintiff also believes that she was discriminated against when in the week of August 16, 2010, she was not allowed to change her CWS day off, which would have been Friday, August 20, 2010, to Monday, August 23, 2010.  Ex. 1 at 66:22-67:5.

179.	Plaintiff was at the 2010 BIG conference on Friday, August 20, 2010.  Ex. 1 at 14-24.

180.	On the basis of an explanation from Griswold, Gomez believed that as a condition of attending the 2010 BIG conference, Plaintiff agreed to suspend her CWS during the week she was attending the conference because the conference had sessions Monday to Friday.  Ex. 22 ¶ 14.

181.	Because Gomez believed that Plaintiff was not on a CWS during the week of the 2010 BIG conference, Gomez did not believe that Plaintiff missed out on a CWS day off that Friday that should be used some other time.  Ex. 22 ¶ 15.

### J.	Training

182.	In December 2011, Plaintiff requested that Gomez approve her request for HUD to pay for her attendance at the 6th Annual HR & EEO in the Federal Workplace Conference, April 11-13, 2012.  Ex. 33 (authenticated at Ex. 22 ¶ 15).

183.	The form Plaintiff submitted to make that request stated that costs for tuition and fees would

be $1,095, plus $829 for travel and per diem.  Ex. 33 at 2.

184.     That request was denied because training funds were limited, the training required travel to Washington, D.C., Gomez did not think the training was essential to the performance of Plaintiff's duties and responsibilities, and travel funds were not authorized by HUD FPM Headquarters for any such purposes.  Ex. 22 ¶ 17.

185.     In 2010-12, training funds for Region VIII FPM were very limited.  Ex. 22 ¶ 18.

186.     During that time period, Plaintiff's requests for training were denied because training funds were limited, the training involved travel, and/or Gomez did not think that the training Plaintiff requested was essential to the performance of Plaintiff's duties and responsibilities.  Ex. 22 ¶ 19.

## K.     Elevator Time

187.     Plaintiff understood that HUD employees could take "elevator time," that is, not have to be at work during a 15-minute window of time after scheduled arrival, before scheduled departure, and around lunch times.  Ex. 1 at 30:2-9.

188.     Plaintiff was told of elevator time when she first started at HUD by a human resource ("HR") specialist.  Ex. 1 at 29:19-30:9.

189.     The idea of elevator time was never re-communicated to Plaintiff after the HR specialist told her about it.  Ex. 1 at 29:19-31:19.

190.     Plaintiff never saw a written elevator-time policy.  Ex. 1 at 33:14-24.

191.     Plaintiff was denied elevator time once or twice.  Ex. 1 at 43:23-24.

192.     Plaintiff had to take annual leave for elevator time on two or three occasions.  Ex. 1 at 45:9-11.

193.     Neither Gomez nor Goin believed that elevator time existed for Region VIII FPM employees.

Ex. 1 at 36:19-37:12.

## L.      Performance Review

194.    Plaintiff alleges that but for discrimination, all of her performance reviews would have been the highest rating.  Ex. 1 at 112:15-17.

195.    For the period from May 2010 to September 2010, Gomez completed Plaintiff's Performance Appraisal and rated her "Fully Successful" in each element.  Ex. 22 ¶ 20.

196.    Gomez rated Plaintiff "Fully Successful" instead of a higher rating because he did not believe her work merited a higher rating.  He had limited personal observation of Plaintiff and relied largely on the input of Griswold.  Ex. 22 ¶ 21.

197.    For the period from April 2011 to September 2011, Goin completed Plaintiff's Performance Appraisal and rated her "Fully Successful" in each element.  Ex. 34 (authenticated by Ex. 9 ¶ 15).

198.    Goin did not give Plaintiff a higher rating because she did not believe that Plaintiff's work merited a higher rating based on the quality of Plaintiff's work from what Goin observed as Plaintiff's supervisor.  Ex. 42 (Goin Decl.) ¶ 2.

## M.      Public Affairs Officer ("PAO") GS-14 Position

199.    Plaintiff alleges that she was obstructed from applying for a PAO GS-14 position in the Denver FPM Region VIII office because she was on paid administrative leave during the time it was open, and she was not able to hold herself out as a HUD employee during that time.  Ex. 1 at 136:20-25.

200.    A PAO GS-14 position for the Denver office opened for applications on March 9, 2012, and closed for applications on March 23, 2012.  Ex. 22 ¶ 16.

201.    Plaintiff was aware of that announcement on March 15, 2012, because it was forwarded to

her.  Ex. 1 at 139:5-6.

202.    HUD did not hire anyone as a result of that announcement.  Ex. 22 ¶ 17.

203.    HUD later announced a PAO GS-14 position in Denver in May 2012 from which a selection

was made.  Ex. 22 ¶ 17.

### N.    Announcement to Latino Network

204.    On March 12, 2012, at 7:55 a.m., Nelson Bregon (who worked in FPM headquarters in

Washington, D.C.) forwarded the vacancy announcement for the PAO GS-14 in Denver to the

"Latino Network."  Ex. 35 (authenticated at Ex. 1 at 138:8-17).

205.    On March 12, 2012, at 9:50 a.m., Guadalupe Herrera forwarded that email to Plaintiff (and

eight others).  Ex. 35.

206.    Plaintiff read that email on or about March 15, 2012.  Ex. 1 at 139:5-6.

207.    There are black Latinos, female Latinas, and black female Latinas.  Ex. 1 at 141:12-18.

208.    Plaintiff did not apply for the PAO GS-14 position.  Ex. 1 at 142:12-16.

## V.    Other HUD Employees

209.    Plaintiff alleges that the following HUD employees were similarly situated to her: Sylvia

Cabrera, Effie Russell, Denise Hernandez, Christine Baumann, Pauline Zvonkovic, Jim Graver,

Terry Brey, and Steve Eggleston.  Ex. 36 at 2-3.

### A.    Sylvia Cabrera

210.    Cabrera was a Management Analyst, GS-12, in Denver's FPM Region VIII office, from at

least 2007 to October 31, 2012.  Ex. 9 ¶ 3.

211.    As of 2012, Cabrera had worked in FPM about 10 years.  Ex. 4 at 248:8-10.

212.    As of 2012, Cabrera had worked in HUD for about 24 years.  Ex. 37 at 5:25-6:2.

213.    Cabrera did not receive any discipline while working in HUD Region VIII.  Ex. 37 at 13:3-6.

214.    Gomez believed that Cabrera had done rotations in Multifamily and Single Family.  Ex. 3 at 215:14-23.

215.    Before Gomez was in FPM, Cabrera had rotated through HUD's office of Public Housing and Multifamily; Cabrera had also had a job in Public Housing.  Ex. 3 at 239:17.

216.    Cabrera was not an intern when she performed those rotations.  Cabrera, MSPB Day 2, 252:24-243:2.

217.    Another Region VIII FPM employee, Carmen Clairmont, also did a couple of rotations.  Ex. 37 at 54:22-55:1.

## B.    Effie Russell

218.    As of 2012, Russell was a Senior Management Analyst, GS-13, in Denver's FPM Region VIII office.  Ex. 4 at 211:16-22; 231:23-24.

219.    Russell was promoted into that position in February 2010.  Ex. 4 at 211:23-3.

220.    For five years before she was promoted to Senior Management Analyst in FPM, Russell was a Field Economist in HUD's Region VIII.  Ex. 50 at 225:13-22.

221.    Before working at HUD, Russell worked for four years in private banking and 10 years in retail, seven of which were in management.  Ex. 4 at 232:2-15.

222.    Russell has a Master of Arts in Economics and a Master of Science in Finance.  Ex. 4 at 232:16-18.

223.    Russell has never been disciplined while working at HUD.  Ex. 9 ¶ 4.

224.    In 2011, Gomez denied Russell's request to take training in appropriations law.  Ex. 4 at 229:6-9.

### C.   Denise Hernandez

225.   Hernandez is a Secretary, GS-9, in Denver's FPM office.  Ex. 4 at 257:6-13.

226.   Hernandez has worked in FPM since 1997.  Ex. 49 at 257:14-16.

227.   Hernandez has never been disciplined while working at FPM.  Ex. 38 at 11:21-25.

228.   Gomez approved Hernandez for situational – not regular – telework.  Ex. 38 at 22:10-18.

### D.   Christine Baumann

229.   Baumann was hired as a Presidential Management Fellow in August 2011, GS-11, was promoted to a GS-12 position in August 2012, and completed that program in August 2013, when she converted to a regular position as Senior Management Analyst, GS-13.  Ex. 22 ¶ 25.

230.   Baumann started working in Region VIII FPM in August 2011.  Ex. 22 ¶ 26.

231.   Baumann has never been disciplined while at HUD.  Ex. 22 ¶ 27.

232.   Baumann did not work a CWS.  Ex. 22 ¶ 28.

233.   Baumann did not request a regular telework schedule.  Ex. 22 ¶ 29.

### E.   Pauline Zvonkovic

234.   Zvonkovic is a Senior Management Analyst who works in HUD's Salk Lake City office.  Ex. 4 at 111:9-15.

235.   She has worked in that office about 16 years.  Ex. 4 at 111:16-18.

236.   Zvonkovic was supervised by Kelly Jorgensen and has been since at least 2010.  Ex. 9 ¶ 5.

237.   Garcia and Gomez assigned Zvonkovic to be the FRICH POC after Plaintiff.  Ex. 4 at 113:2-20.

238.   Zvonkovic had performed that duty before.  Ex. 4 at 113:17.

### F.   Jim Graver

239.     During 2010-2012, Graver was a Senior Management Analyst.  Ex. 39 at 5:4-5.

240.     As of 2012, Graver had worked about 10 years in FPM and 25 years at HUD.  Ex. 39 at 5:6-15, 13:18-14:10.

241.     Graver had never been disciplined while at FPM.  Ex. 39 at 18:11-13.

242.     During 2010-2012, Graver's work initially involved Regional Web Manager duties and then involved Senior Management Analyst duties, including primarily disaster recovery and preparedness, the customer service assessment, web input coordination and updates, FPM Sharepoint, and hud@work responsibilities.  Ex. 22 ¶ 33.

**G.     Terry Brey**

243.     During 2010-2012, Brey was a Customer Service Representative, GS-7.  Ex. 9 ¶ 6.

244.     During that time, Brey's supervisor was Gomez.  Ex. 9 ¶ 7.

245.     Brey started with HUD in his current position with FPM in June 2006.  Ex. 9 ¶ 8.

246.     Brey had never been disciplined at HUD.  Ex. 9 ¶ 9.

247.     Brey's main duties involved routing and logging customer service calls and customer walk-ins.  Ex. 9 ¶ 10.

**H.     Steve Eggleston**

248.     Eggleston was a Management Analyst, GS-13, from July 2000 to July 2011, in the Region VIII FPM office, when he took the position of Field Office Director of the HUD Des Moines, Iowa office.  Ex. 9 ¶ 11.

249.     Eggleston's supervisor from 2010 to 2011 was Gomez.  Ex. 9 ¶ 12.

250.     Eggleston started in Denver FPM in July 2000 and with HUD in 1999.  Ex. 9 ¶ 13.

251.     He had never been disciplined while at HUD.  Ex. 9 ¶ 14.

33

252.   Eggleston did a two-week rotation in Single Family Housing.  Ex. 4 at 32:22-33:9.

**VI.   Allegedly Discriminatory Comments**

    **A.   <u>Race</u>**

253.   As relevant to this case, Plaintiff alleges that five people discriminated against her on the basis of race: Griswold, Gomez, Goin, Garcia, and Gerrish.  Ex. 1 at 234:23-235:4.  She also believes that Bregon's sending the PAO GS-14 announcement to the "Latino Network," as described above, shows discrimination towards her.  Ex. 1 at 140:23-141:4.

254.   Griswold's alleged comments that Plaintiff asserts were racist are:

    (a)   I question you possessing a master's degree.  Ex. 1 at 235:10-16.
    (b)   Do you know why you're resented by the secretary, who's been here 20 years and is only a GS-9?  Ex. 1 at 235:18-20.
    (c)   I'm going above and beyond to make sure you get there [to the BIG conference], and you should feel fortunate that I'm doing this extra effort and actions, because it wasn't available until my actions and initiative.  Ex. 1 at 235:22-236:2.
    (d)   After President Obama's election, Griswold told Plaintiff not to be as vocal of her support of him.  Ex. 1 at 236:6-24.
    (e)   Griswold made a comparison of football in an email (it feels like a football game, that we're going back and forth on the plays).  Ex. 1 at 237:8-21.

255.   The alleged comments in (a) and (b) were made on May 27, 2010.  Ex. 40 at 25.

256.   Gomez's alleged comments that Plaintiff alleges were racist were:

    (a)   Before you see the light, you must deal with the darkness (in a fortune-cookie fortune he gave Plaintiff).  Ex. 49 at 238:1-13.
    (b)   If I were in your position, I'd probably get a couple of lawnmowers.  Ex. 49 at 238:15-16.
    (c)   You have only one friend.  Ex. 49 at 238:18.
    (d)   I don't know you well enough.  Ex. 49 at 238:20.

257.   Goin's alleged comments that Plaintiff alleges were racist were:

    (a)   "Hey, boy" in 2008 to a brown Latino worker in the mailroom.  Ex. 49 at 239:23-240:22.
    (b)   Her statements on February 26, 2010 (described above in section IV(A)

regarding other employment matters).  Ex. 49 at 240:23-241:2.

    (c)    Good job, maybe one day you'll be able to attend events, but not for now (after Plaintiff got press to attend a public event).  Ex. 49 at 241: 4-16.

    (d)    Allegations that Plaintiff stole and charged something.  Ex. 49 at 242:4-17.

258.    Garcia's comments that Plaintiff alleges were racist:

    (a)    Perhaps you haven't been in FPM long enough.  Ex. 49 at 243:11.

    (b)    In his MSPB testimony, when he characterized Plaintiff's responses to Gomez's emails as saying, "Bring it on."  Ex. 1 at 243:13-20.

259.    As for Gerrish, Plaintiff did not hear him say anything racist, nor was it reported to her by anyone else that they heard Gerrish say anything racist.  Ex. 49 at 248:20-4.

## B.    <u>Color</u>

260.    Plaintiff alleges that the same people who discriminated against her on the basis of her race also discriminated against her on the basis of her color.  Ex. 1 at 249:16-252:25.

261.    Plaintiff believes that the same comments that demonstrated racial bias by Griswold, Gomez, Goin, Garcia, and Gerrish also demonstrated bias on the basis of color .  Ex. 1 at 33:14-24.

## C.    <u>Sex</u>

262.    Plaintiff believes that the same comments that demonstrated racial bias by Griswold, Gomez, Goin, Garcia, and Gerrish also demonstrated bias on the basis of sex .  Ex. 1 at 254:7-17.

## D.    <u>Retaliation</u>

263.    **Griswold**: Plaintiff never heard Griswold say anything or read anything Griswold wrote that indicated to Plaintiff that Griswold was hostile towards people exercising their rights to complain about employment discrimination.  Ex. 49 at 256:1-6.

264.    **Goin**: Plaintiff never heard Goin say anything or  read anything Goin wrote that indicated to Plaintiff that Goin was hostile towards people exercising their rights to complain about employment discrimination.  Ex. 49 at 256:23-257:6.

265.   **Gomez**: Plaintiff never heard Gomez say anything or read anything Gomez wrote that indicated to Plaintiff that Gomez was hostile towards people exercising their rights to complain about employment discrimination.  Ex. 49 at 257:7-259:11 (esp. 258:11-12 ("I have not seen his written communications for those particular circumstances.")).

266.   **Garcia**: The only things Plaintiff heard or read that Garcia said or wrote that indicated to Plaintiff that he was hostile towards people exercising their rights to complain about employment discrimination were in his discipline decisions and in his testimonies and admissions.  Ex. 49 at 259:18-260:10.

267.   **Gerrish**: The only things Plaintiff heard or read that Gerrish said or wrote that indicated to Plaintiff that Gerrish was hostile towards people exercising their rights to complain about employment discrimination were that he told Plaintiff that her situation was "shit."  Ex. 49 at 260:11-261:9.

**VII.   EEO Process**

268.   Plaintiff made initial contact with an EEO counselor on September 30, 2010, to discuss alleged discrimination against her.  Ex. 4 at 322:2-19.

269.   Forty-five days before September 30, 2010, was August 17, 2010.  *See* Fed. R. Civ. P. 201 (judicial notice).

270.   With regard to the allegations in this case, Plaintiff filed an informal EEO complaint, a formal complaint, and an amended formal complaint.  Ex. 1 at 261:10-20.

271.   The formal complaint was filed February 20, 2011.  Ex. 40 at 1.

272.   In the underlying EEO case, Plaintiff also deposed Crow Willard, Gomez, Griswold, Hernandez, Cabrera, and may have deposed additional people.  Ex. 49 at 261:21-24.

273.    Plaintiff also filed with the MSPB an appeal of her removal in which she alleged that she was

removed on the basis of discrimination.  Ex. 1 at 262:3-5.

274.    In the MSPB proceedings, she deposed LaPorte, Escalante, and Gomez, and there was a

three-day hearing.  Ex. 49 at 262:6-11.

275.    Since Plaintiff was removed, she has filed two additional EEO complaints: one more against

HUD and one against the Department of the Interior.  Ex. 49 at 263:3-264:1.

## VIII.    FLSA

276.    Plaintiff alleges that the agency violated the FLSA as follows.  Ex. 41.

    (a)    Within weeks of Plaintiff's start at HUD on April 28, 2008: violation not specified;

    (b)    March 9, 2009: 15 minutes overtime not paid;

    (c)    July 22, 2010: four minutes overtime not paid;

    (d)    October 28, 2010: 25 minutes overtime not paid;

    (e)    January 26, 2011: three minutes overtime not paid;

    (f)    May 23, 2011: agency "deemed replies/responses" from Plaintiff on FMLA leave;

    (g)    June 6, 2011: agency "deemed replies/responses" from Plaintiff on FMLA leave;

    (h)    July 6, 2011: 22 minutes overtime not paid;

    (i)    July 19, 2011: 25 minutes overtime not paid;

    (j)    July 21, 2011: Plaintiff charged 3.5 hours AWOL;

    (k)    October 27, 2011: Plaintiff issued suspension on CWS day off;

    (l)    December 20, 2011: 15 minutes overtime not paid;

    (m)    December 28, 2011: 18 minutes overtime not paid;

    (n)    January 12, 2012: Plaintiff on LOOP because Gomez improperly denied her official time to perform EEOC matters/meeting off premises;

    (o)    January 16, 2012: Martin Luther King, Jr., Day;

    (p)    January 16, 2012: Plaintiff improperly denied 10 hours of federal holiday pay time by Gomez and his later April 9, 2012 correction created a $57.97 bill after her removal.

277.    Plaintiff never requested comp time.  Ex. 5 at 100:2-7.

278.    Plaintiff was paid for Martin Luther King, Jr., Day 2012, although initially HUD did not pay

her for that day.  Ex. 1 at 265:17-20.

37

279.    The original Complaint in this case was filed June 18, 2014.  Docket #1.

280.    Plaintiff was not employed by HUD in 2014.  Ex. 18.

## IX.    FOIA

### A.    Request 11-FI-R08-02602

#### 1)    Request and Initial Response

281.    On August 29, 2011, Plaintiff submitted a document addressed to Regional Administrator Garcia titled, "Request for information; and Request for Extension of Time to Reply," ("August 29, 2011 Request").  Ex. 1 (Gerrish Decl.) ¶ 5.

282.    Plaintiff requested the agency provide information so she could respond to proposed discipline that was issued to her on August 15, 2011.  Ex. 1 ¶ 5.

283.    Plaintiff's letter directed that if the agency refused to provide the requested information, and only upon refusal, the agency was to then consider the request for information to be made pursuant to FOIA and the Privacy Act.  *Id.*

284.    Plaintiff requested the following 15 separately numbered items in the August 29, 2011 Request.  Ex. 1 ¶ 6.

    (1)    "For the time period [three years prior to the date of the proposed action], through the present, copies of any proposed disciplinary or adverse actions issued to agency employees for the offenses of (1) Refusal to Comply with Proper Order; (2) Rude Contact; (3) Absent Without Leave ("AWOL"); (4) Failure to Follow Leave Procedures and/or like offenses/charges.  The documents requested in requests #1, #2 and #3 will be accepted in sanitized form (with the names deleted) in order to protect the privacy of the individuals involved."

    (2)    "For the documents disclosed in response to the request immediately above, the final agency decision."

    (3)    "For the documents disclosed in response to the request immediately above, the decision after appeal, whether through the agency grievance process, a negotiated grievance process, the [MSPB], the Federal Labor Relations Authority, the [EEOC], or any other administrative or judicial forum";

(4) "Copies of all documents applicable to [HUD] concerning disciplinary and adverse actions, including regulations, handbooks, procedures, bulletins, and supplements (excluding links provider in Jane Goin's proposal and the HUD AFGE Agreement handbook)."

(5) "Copies of any Table of Penalties applicable to HUD's employees."

(6) "Copies of any and all files, documents, memoranda, drafts, or notes maintained by the proposing official, Jane Goin, yourself, Rick M. Garcia, the Labor and Employee Relations Division ("LER") and/or the Civilian Personnel Office ("CPO"), or any other office in the agency which mention or pertain to the following: me and my affirmative defenses; the proposed action against me; and any favorable information, including witness statements and any consideration of seeking a lesser penalty."

(7) "Copies of all proposed and final disciplinary and adverse actions taken against agency employees in which Jane Goin and/or you (Rick Garcia) have served as proposing or deciding officials."

(8) "A copy of the agency's official case file relating to this matter."

(9) "A copy of my Official Personnel File."

(10) "Copies of my performance appraisals/awards for the last three years."

(11) "Copies of all drafts of the proposed letter and of any documents; records of advice, or notes, including notes made by, for, or regarding Jane Goin's decision to propose the adverse action at issue."

(12) "Copies of all communications from/to any official regarding the proposed suspension."

(13) "Copies of all communications from/to any official regarding my affirmative defenses thereto."

(14) "Copies of all my communications to any official regarding the proposed suspension."

(15) "Any other documents relating to this proposed adverse action or regarding my past employment record that have not yet been furnished to me."

285. On September 6, 2011, Gerrish sent Plaintiff an email responding to her August 29, 2011 Request and provided information Gerrish determined that Plaintiff was allowed to receive through the disciplinary process. Ex. 1 ¶ 7. The email contained links to requested information and attached documents addressing Plaintiff's requested items 4, 5, 9, and 10. *Id.* The email stated that the items not released in the email would be considered under FOIA and the Privacy Act. *Id.* Plaintiff later claimed those links did not work, but she did not exhaust any claims to these requests and was provided the documents in her administrative and then district court litigation. Docket #146-1 at 44.

286.    On September 6, 2011, Gerrish forwarded Plaintiff's August 29, 2011 Request to Denise Hernandez, Region VIII FOIA Liaison, and identified the remaining items (1-3, 6-8, and 11-15) that needed to be processed as an FOIA request.  Ex. 1 ¶ 8.

287.    Hernandez logged Plaintiff's request into HUD's FOIA tracking system, called FOIA Xpress, which assigned it request 11-FI-R08-02602.  Ex. 1 ¶ 9.

288.    Gerrish searched for documents requested by Plaintiff.  Ex. 1 ¶ 11.  Gerrish looked for draft documents and notes regarding Plaintiff's proposed discipline and email communications with her supervisors.  *Id*.  As is his standard practice, Gerrish created a subfolder in his in-box with his employee's name.  *Id*.  All email communications about that employee are placed in that subfolder. *Id*.  Gerrish found some responsive documents to requests 8, 11, 12, 14, and 15 that had been previously provided to Plaintiff as attachments to the August 15, 2011 Proposed Suspension.  *Id*. For request 7, Gerrish also checked for previous discipline issued by Goin or Garcia and did not find any responsive documents.  *Id*.  Gerrish's search was reasonably calculated to located responsive documents.  *Id*.

289.    On October 19, 2011, Gerrish provided Plaintiff a response letter to request 11-F1-R08-02602 and the responsive documents.  Ex. 1 ¶ 14.  The October 19, 2011 Response granted part of Plaintiff's request, withheld some requested documents, and provided information on Plaintiff's right to appeal.  *Id*.

290.    Plaintiff sent Gerrish an email on October 19, 2011, acknowledging receipt of the response. *Id*.

291.    In the October 19, 2011 Response, the agency withheld documents responsive to requests 6, 8, and 11-15 pursuant to the exemption at 5 U.S.C. § 552(b)(5) ("Exemption 5").  Ex. 1 ¶ 5.

40

(a)     The documents Gerrish did not release did not contain pre-decisional deliberative communications amongst and between him and management officials pertaining to advice and guidance related to Plaintiff's discipline. *Id.*

(b)     Subject to the attorney-client privilege, Gerrish also did not release confidential communications between management officials, Gerrish, and attorneys in the Region VIII OGC, in which legal advice regarding Plaintiff was either sought or given. *Id*

292.    In the October 19, 2011 Response, the agency withheld documents responsive to requests 1-3 pursuant to U.S.C. § 552(b)(6) ("Exemption 6") because disclosure of employee disciplinary actions would constitute a clearly unwarranted invasion of personal privacy.  Ex. 1 ¶ 6.

(a)     The agency determined that even with the names deleted, it may be possible to determine the identity of the individuals involved.  *Id.*

(b)     Gerrish concluded that Exemption 6 applies because the information is contained in a personnel or similar file and disclosure would be a clearly unwarranted invasion of personal privacy.  *Id.*

(c)     Gerrish made the latter determination because individuals have a privacy interest in discipline imposed on them, and Gerrish is aware of no public interest that would be served by release of the information.  *Id.*

(d)     Gerrish also advised Plaintiff documents responsive to request 3 could be found on public websites.  *Id.*

293.    The responses to the individual requests are summarized in the table attached to Gerrish's declaration. Ex. 1, Ex. A.

294.    Gerrish also advised Plaintiff that there may be documents responsive to her request in other HUD offices, and that he would refer that part of her request to Vicky Lewis, Assistant Executive Secretary, OCHCO, FOIA Branch, Office of the Executive Secretariat. Ex. 1 ¶ 18.  Through an oversight, that referral did not formally occur until March 1, 2012.  *Id.*

###     2)     **Appeal**

295.    On December 1, 2011, HUD's Office of FOIA Appeals received a letter from Plaintiff dated November 15, 2011, appealing the agency's October 19, 2011 Response to Request 11-FI-R08-2602.

Ex. 1 ¶ 20.

296.    In the appeal letter, Plaintiff repeated her request for 11 of the items she requested in the August 29, 2011 Request. *Id*.  She also listed four new requests for information. *Id*.

297.    Requests 4, 5, 9, and 10 of the August 29, 2011 Request were not included in Plaintiff's appeal. *Id*.

298.    In a letter dated December 29, 2011, Peter Constantine, Associate General Counsel for Ethics and Personnel Law, provided the Agency response to Plaintiff's appeal.  Ex. 1 ¶ 20 Ex. 1, Ex. C.

299.    The Agency denied Plaintiff's appeal of HUD's decision to withhold documents pursuant to FOIA Exemptions 5 and 6; returned Plaintiff's request to Region VIII for additional processing for documents that may be located outside Region VIII; and returned to Region VIII for processing related to Plaintiff's new requests for documents that constituted a separate and distinct FOIA request. Ex. 1 ¶ 20.  The letter provided information on Plaintiff's right to judicial review.  *Id*.

300.    The appeal decision found that Plaintiff's Request for documents located outside Region VIII was not processed properly pursuant to 24 C.F.R. § 15.104(a) because the Request was not forwarded to the correct office within ten working days. Ex. 1 ¶ 21.

301.    On February 16, 2012, Gerrish received an email from Plaintiff inquiring about the status of her FOIA requests. Ex. 1 ¶ 23; Ex. 1, Ex. D.  Plaintiff also included two new requests in that email. *Id*.

302.    On February 17, 2012, Gerrish received an email from OGC attorney Avril Sisk, which forwarded Plaintiff's February 16, 2012 email and provided direction on responding to Plaintiff's FOIA requests. Ex. 1 ¶ 24.

303.    On March 1, 2012, Gerrish forwarded information to Denise Hernandez. Ex. 1 ¶ 25.  On

March 2, 2012, Denise Hernandez logged in the portions of Plaintiff's appeal letter dated November 16, 2011, that requested new information as a new FOIA request and designated it Request 12-FI-R08-01178 (discussed below).  *Id.*

304.    By memorandum dated March 1, 2012, Gerrish referred the portion of Plaintiff's first FOIA Request 11-FI-R08-02602 for information located outside Region VIII to Vicky Lewis, Assistant Executive Secretary and Acting Chief, OCHCO, FOIA Branch, Office of the Executive Secretariat. Ex. 1 ¶ 26.

   **B.    Request 12-FI-R08-01178**

305.    On March 8, 2012, Gerrish forwarded Plaintiff's email dated February 16, 2012, to Denise Hernandez to be filed under a new FOIA request.  Ex. 1 ¶ 27.

306.    Hernandez logged Plaintiff's request into HUD's FOIA tracking system called FOIA Express, which designated it Request 12-FI-R08-01178.  Ex. 1 ¶ 28.

307.    Request 12-FI-R08-01178 included six items – four new requests Plaintiff included in her appeal dated November 15, 2011, regarding Request 11-FI-R08-02602, and two included in her email dated February 16, 2012.  Ex. 1 ¶ 29.

308.    Gerrish provided Plaintiff a Response to Request 12-FI-R08-01178 in a letter dated March 20, 2012.  Ex. 1 ¶ 32; Ex. 1, Ex. E.

309.    The Response informed Plaintiff that she could appeal that Response to the agency's OGC. Ex. 1, Ex. E at 2.

310.    Plaintiff acknowledged receiving that Response on March 20, 2012.  Ex. 1 ¶ 37.

311.    Plaintiff did not appeal the Response to Request 12-FI-R08-01178.  Ex. 1 ¶ 38.

   **C.    Request 12-FI-R08-01228**

312.     Plaintiff submitted a Request dated March 5, 2012, addressed to Regional Administrator Garcia. Ex. 1 ¶ 39; Ex.1, Ex. F.

313.     In that Request, Plaintiff asked that the agency provide information so she could respond to the Notice of Proposed Removal issued to her on February 23, 2012. Ex. 1 ¶ 39. Plaintiff's letter directed that if the agency refused to provide the requested information, and only upon refusal, the agency was to then consider the request for information to be made pursuant to FOIA and the Privacy Act. *Id.*

314.     Gerrish sent Plaintiff an email on March 8, 2012, and attached the Agency Response, dated March 9, 2012, to Plaintiff's Request as it related to her adverse action. Ex. 1 ¶ 40.

315.     Gerrish informed her that because the Request was being denied, the agency would begin to process it as a FOIA request. *Id.*

316.     In an email dated March 10, 2012, Plaintiff amended her March 5, 2012 Request seeking information about disciplinary actions by adding "Removal from HUD" and "Removal from Federal Government" to the listed items in Request 1. Ex. 1 ¶ 41.

317.     Hernandez logged Plaintiff's requests into HUD's FOIA tracking system, called FOIA Xpress, which designated it Request 12-FI-R08-01228. Ex. 1 ¶ 42.

318.     Together with the March 10, 2012 amendments, Request 12-FI-R08-01228 contained 17 specific requests. Ex. 1 ¶ 43.

319.     Gerrish mailed Plaintiff a Response to Request 12-FI-R08-01228 on April 2, 2012. Ex. 1 ¶ 47; Ex. 1, Ex. G.

320.     The Response informed Plaintiff she could appeal that Response to the Agency's OGC. Ex. 1, Ex. G at 5-6.

321.    Plaintiff did not appeal the Response to Request 12-FI-R08-012228. Ex. 1 ¶ 51.

D.    **Request 12-FI-HQ-01478**

322.    On or about March 27, 2012, Gerrish sent a memorandum to Vicky Lewis, Deputy Director

and Acting Chief, FOIA Branch, referring to Headquarters the portions of FOIA Number 12-FI-R08-

01228 (mistakenly numbered as 1178) relating to national information. Ex. 1 ¶ 52. The documents

requested from Headquarters were as follows. *Id.*

> (a)    "For the time period [three years prior to the date of the proposed action], through the present, copies of any proposed disciplinary or adverse actions issued to agency employees for the offenses of (1) Refusal to Comply with Proper Order"; (2) Rude Conduct Towards Supervisor; (3) Failure to Follow Directives; (4) Absent Without Leave (AWOL); (5) Rude conduct; (6) Failure to Follow Leave Procedures and/or like offense/charges; (7) Removal from HUD; and (8) Removal from Federal Government."
>
> (b)    "For the documents disclosed in response to the request immediately above, the final agency decision."
>
> (c)    "For the documents disclosed in response to the request immediately above, the decision after appeal, whether through the agency grievance process, a negotiated grievance process, the [MSPB], the Federal Labor Relations Authority, the [EEOC], or any other administrative or judicial forum."

323.    Headquarters FOIA Branch logged the referral of Plaintiff's Request into the FOIA Xpress

system, which designated it Request 12-FI-HQ-01483. Ex. 1 ¶ 53.

324.    On April 10, 2012, McGirt contacted Gerrish stating it was his opinion that all items had

been addressed. Ex. 1 ¶ 54.

325.    On April 11, 2012, Gerrish emailed McGirt stating that the referral was for all documents

outside of the Denver Region. Ex. 1 ¶ 55.

326.    On April 11, 2012, McGirt emailed Gerrish and stated that it appeared from the Request and

Response that all documents were related to Denver. Ex. 1 ¶ 56.

327.    After Gerrish received the April 11, 2012 email from McGirt, Gerrish was not aware whether

McGirt had provided responsive documents to Plaintiff.  Ex. 1 ¶ 57.

### E.      Request 15-FI-HQ-00942

328.    On March 19, 2015, McGirt became aware that the Agency had inadvertently failed to provide all documents responsive to Plaintiff's FOIA Request 12-FI-HQ-01483, and that a response was necessary.  Ex. 2 ¶ 11.

329.    As a result, McGirt created Request 15-FI-HQ-00942 in order to respond to Plaintiff's request.  Ex. 2 ¶ 12.  Request 15-FI-HQ-00942 includes all of the items of Request 12-FI-HQ-01483. *Id*.  A new FOIA request number was created because so much time had passed and in order to track the agency's response efficiently.  *Id*.

330.    On March 19, 2015, McGirt sent a letter via email to Plaintiff acknowledging receipt of Request 15-FI-HQ-00941.  Ex. 2 ¶ 13.

331.    On March 19, 2015, McGirt forwarded the Request to Rose Butler, the Correspondence Unit Chief in UCHCO, asking her to search for the following, based on Plaintiff's March 5, 2012 Request and March 10, 2012 Amendment.  Ex. 2 ¶ 14.

> Copies of any proposed disciplinary or adverse action issued to agency employees for the following offenses covering the time period three years prior to the date of the proposed action, through March 10, 2012: (I) Refusal to Comply with Proper Order; (ii) Rude Conduct Towards Supervisor; (iii) Failure to Follow Directives; (iv) Absent Without Leave (AWOL); (v) Rude Conduct; (vi) Failure to Follow Leave Procedures and/or like offenses/charges; (vii) Removal from HUD; and (viii) Removal from Federal Government.

332.    On March 19, 2015, Butler forwarded the Request to Jacqueline Mercer-Hollie, Director, Employee and Labor Relations Division, and Michael Stein, Deputy Director of the same division. Ex. 2 ¶ 15.

333.    On March 19, 2015, Mercer-Hollie forwarded the Request to Ginger Richardson, ELR

Branch Chief for Region VIII.  Ex. 2 ¶ 16.

334.    On March 19, 2015, Richardson assigned the Request to Gerrish as the point of contact to gather nationwide information.  Ex. 1 ¶ 63.

335.    On March 20, 2015, Gerrish forwarded the Request to ELR Specialists nationwide, asking them to search their files, and requesting responsive copies. Ex. 1 ¶ 64; Ex. 2 ¶ 18.

336.    The ELR Specialists would most likely have access to documents related to discipline because they maintain such documents as part of their jobs and all discipline issued in the Agency should be maintained by an ELR Specialist.  Ex. 1 ¶ 65.

337.    Documents related to discipline are maintained in files.  Ex. 1 ¶ 66.

338.    In addition to the documents requested above, in Gerrish's March 20, 2012 letter responding to Plaintiff's FOIA Request Number 12-FI-R08-01178, Gerrish stated that the portion of Plaintiff's Request seeking communications regarding her affirmative defenses, and communications regarding the proposed suspension, would be referred to the Office of Departmental Equal Employment Opportunity ("ODEEO"), the Agency's office that handles EEO matters and that specifically handled Plaintiff's EEO complaint.  Ex. 2 ¶ 21.

339.    To the best of McGirt's knowledge, that referral was never communicated to him or to ODEEO.  Ex. 2 ¶ 22.

340.    After McGirt became aware of the need to request information from ODEEO, on March 23, 2015, McGirt contacted Stephen Smith, Manager, ODEEO, and requested that he search his office's files for the following: copies of all communications to or from any official regarding Plaintiff's affirmative defenses in her 2011 appeal; and copies of all her communications to any official regarding her suspension in 2011. Ex. 2 ¶ 23.

47

341.     Smith, as the Manager of the Equal Employment Opportunity Division ("EEOD"), would most likely have access to the requested documents due to the fact that his office handles EEO complaints and has assisted with FOIA requests in the past.  Ex. 2 ¶ 24.

342.     On March 31, 2015, McGirt received responsive documents from Gerrish.  Ex. 2 ¶ 25.

343.     On March 31, 2015, McGirt received responsive documents from Butler.  Ex.2 ¶ 26.

344.     On April 20, 2015, McGirt provided Plaintiff a Response to Request 15-FI-HQ-00942.  Ex. 2, Ex. A.  The documents requested were: copies of any proposed disciplinary or adverse action issued to agency employees for the following offenses covering the time period three years prior to the date of the proposed action, through March 10, 2012, for:

- (a)     Refusal to Comply with Proper Order;
- (b)     Rude Conduct Towards Supervisor;
- (c)     Failure to Follow Directives;
- (d)     Absent Without Leave (AWOL);
- (e)     Rude Conduct;
- (f)     Failure to Follow Leave Procedures and/or like offenses/charges;
- (g)     Removal from HUD; and
- (h)     Removal from Federal Government;
- (i)     The Final Agency Decision for items (a)-(h);
- (j)     For documents disclosed in response to items (a)-(h), the decision after appeal, whether through the agency grievance process, a negotiated grievance process, the MSPB, the Federal Labor Relations Authority ("FLRA"), the EEOC, or any other administrative or judicial forum;
- (k)     Copies of all communications from/to any official regarding Plaintiff's affirmative defenses; and
- (l)     Copies of all communications from/to any official regarding proposed adverse actions.

345.     Plaintiff's Request was granted in part and denied in part.  Ex. 2 ¶ 28.

346.     With regard to item (j) above, McGirt advised Plaintiff that the information requested could be found on individual government websites, such as FLRA.gov, MSPB.gove, or EEOC.gov, and provided nothing further.  Ex. 2 ¶ 29.

347.    In its Response, the agency invoked the applicable FOIA exemptions and redacted information from the responsive documents.  Ex. 2 ¶ 30.

348.    In each of these documents, FOIA Exemption 6 was invoked in order to redact the names, positions, office information, and other personal information of the affected employees, their supervisors, and others' names (including doctors' names) contained in the documents.  Ex. 2 ¶ 30.

> (a)    McGirt concluded that Exemption 6 applies because the information is contained in a personnel or similar file and disclosure would be clearly an unwarranted invasion of personal privacy.  *Id.*
> (b)    McGirt made the determination because individuals have a privacy interest in discipline imposed on them, and McGirt was aware of no public interest that would be served by release of the redacted information.  *Id.*
> (c)    The redactions were limited to the minimum need to avoid identification of the specific individuals' disciplines.  That included the positions and office information because with the date and nature of the discipline, it would be easy to determine the name of the person disciplined because officers do not have large numbers of employees in the same positions and do not issue many disciplinary actions.  *Id.*

349.    None of the disciplinary actions included in the released documents included high-level officials; that is, none were political appointees and none were in positions of national leadership. Ex. 2 ¶ 31.

## LEGAL STANDARDS

### I.    Summary Judgment

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114,

1122 (10th Cir. 2005). To avoid summary judgment, Plaintiff must "present sufficient, competent, contradictory evidence to establish a genuine factual dispute." *Gen. Steel Domestic Sales, LLC v. Chumley*, __ F.3d __, No. 13-cv-00769-MSK-KMT, 2015 WL 5353080, at *5 (D. Colo. Sept. 15, 2015) (citations omitted). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## II.    *Pro Se* **Plaintiff's Pleadings**

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted). The Tenth Circuit interpreted this rule to mean, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

However, this interpretation is qualified in that it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)). A dismissal "without affording the plaintiff notice or an opportunity to amend is proper only 'when it is patently obvious that plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile.'" *Curley v. Perry*, 246 F.3d 1278, 1281–82

(10th Cir. 2001) (quoting *Hall*, 935 F.2d at 1110 (additional quotation marks omitted)).

The Court thus notes here, at the outset, that the Court has throughout the course of this litigation sought to decipher Plaintiff's prolix filings.  Despite the Court's ample instruction to Plaintiff [*see* dockets ##121, 129] and despite giving Plaintiff extensive time to respond as the Motions were filed in March 2015 (yet Plaintiff did not file the operative Response until September 2015), Plaintiff's Response continues to be plagued by the same issues the Court has seen again and again.  Throughout her Response [*see* docket #137], Plaintiff gives narrative but no contrary evidence or legal authority to support her assertions; she cites to documents that have been superseded; she cites to a jumble of documents without directing the Court to specific parts of the documents, some of which contain hundreds of pages with dozens of exhibits; and she offers inadmissible hearsay.  *See, e.g.*, docket #137, responses to facts ##2, 16(a-e), 19, 28.

The Court is mindful that it must construe the filings of a *pro se* litigant liberally; however, Plaintiff's filings have for the large part been "verbose, redundant, ungrammatical, [and] unintelligible."  *See* D.C. Colo. LCivR 7.1  The filings for these Motions are little different, despite the Court's painstaking efforts to provide Plaintiff with ample opportunity, including allowing three responses to this Motion.  Instead, Plaintiff continues to submit many hundreds of pages of written briefs and documents in an attempt to prove her case; she in the operative Response has attempted to cite appropriately, but she makes voluminous citations not linked to legal argument.  In fact, her legal argument (lacking citations to law) essentially appears in the table of contents to her response (*see* docket #137 at i-v), with the following 100 pages filled with narrative pointing to documents that do not show a material dispute.  Thus, where Plaintiff has not made appropriate links of facts and law, and where her arguments are vague and unclear and listed without a specific reference, the

Court "will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995). As the Seventh Circuit put it, "Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), *quoted in Gross*, *id*.

The Court has extensively reviewed all of Plaintiff's Response and the documents to which she cites, as well as her Surreply [*see* docket #149], and has made a sincere effort to give her the benefit of the doubt. Despite this truffle-hunt, the Court is left with scant arguments made by Plaintiff, instead with page after page of largely unsubstantiated narrative; thus, in the analysis that follows, her arguments are thin or nonexistent because she fails to present them coherently, if at all.

## ANALYSIS

### I.      Discrimination

A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973)." *See Khalik*, 671 F.3d at 1192. "[The] *McDonnell Douglas* . . . three-step analysis requires the plaintiff first prove a *prima facie* case of discrimination." *Id.* To establish a *prima facie* case, "a plaintiff must establish that (1) [he] is a member of a protected class, (2) [he] suffered an adverse employment action, (3) [he] was qualified for the position at issue, and (4) [he] was treated less favorably than others not in the protected class." *Id.* If the plaintiff makes out a *prima facie* case, "[t]he burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If defendant meets that burden, "the burden then shifts back to the plaintiff to show that [his] protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id.*

Defendant argues the Court should grant summary judgment on Plaintiff's discrimination claim because: (A) her claim is limited to what she exhausted; (B) her claim is limited to adverse employment actions, which in this case are five disciplinary decisions, including removal; (C) Plaintiff cannot meet the third prong of the prima facie case for those disciplinary decisions because she has no evidence that those actions took place under circumstances that give rise to an inference of discrimination; and (D) even if she had such evidence, the Agency had a legitimate nondiscriminatory reason for its actions as the decisionmakers had evidence that Plaintiff refused or failed to do work assigned to her or engaged in other misconduct with no evidence that the reason is pretextual.  Docket #106 at 39-40.

Plaintiff appears to argue she exhausted all her claims, that there were dozens of adverse actions, that they all show discriminatory intent, and that Defendant had no legitimate reason for a actions taken against her.  *See generally* docket #137.

A.   **Exhaustion**

Under Title VII, "exhaustion of administrative remedies is a prerequisite to suit." *Apsley v. Boeing Co.*, 691 F.3d 1184, 1210 (10th Cir. 2012) (citing *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005); *MacKenzie v. City of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).  Further, administrative remedies generally must be exhausted as to each discrete instance of discrimination or retaliation.  *Id.* (citing *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1194-95 (10th Cir. 2004)).  The purpose behind the requirement of exhausting a claim with the EEOC is two-fold: "protect[ing] employers by giving them notice of the discrimination claims being brought against them, [and] providing the EEOC with an opportunity to conciliate the claim." *Foster*, 365 F.3d at 1195.  A federal employee is required to contact an EEO counselor "within 45 days of the

date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). Limited types of personnel actions may instead be appealed to the MSPB, including removals, lengthy suspensions, or reductions in pay or pay grade. 5 U.S.C. § 7512. A federal employee may within the MSPB appeal an adverse employment decision if she asserts that the action was made based on discrimination that Title VII disallows. *Kloeckner v. Solis*, 133 S. Ct. 596, 600 (2012) (citing 5 U.S.C. § 7702(a)(1)). The employee may then appeal such decision to U.S. District Court, where any discrimination issue is reviewed de novo. 5 U.S.C § 7703(c).

Defendant argues Plaintiff did not exhaust any discrimination claim that allegedly occurred before August 17, 2010, 45 days before she contacted the EEO counselor on September 30, 2010. Docket #106 at 41; *see* facts ##268-69. Defendant grants that Plaintiff exhausted through the MSPB her claim that she was removed because of discrimination. *Id.*; *see* fact #273. But the MSPB's limited jurisdiction means that she did not exhaust any other claims through the MSPB. Docket #106 at 41. Plaintiff counters that "all Plaintiff's continuing discrimination violation claims and theory were exhausted in administrative proceedings." Docket #137 at iii.[3]

The Court agrees with Defendant's analysis and concludes Plaintiff did not exhaust the following claims:

(a)     February 26, 2010 comments by Goin;
(b)     not being notified of or hired into a GS-13 Management Analyst position, the hiring for which occurred in February 2010;
(c)     not being placed in a GS-13 position when she converted to a permanent position in FPM on May 9, 2010;
(d)     any actions by Griswold before August 17, 2010 (Gomez became acting

---

[3]Plaintiff's Response essentially only makes legal argument in a table of contents at the introduction to her Response and does not contain citations to law with the exception of her arguments regarding summary judgment in general and regarding her FOIA claims. Thus, the Court cites to Plaintiff's table of contents in an effort to allow that to provide her legal argument, which is largely lacking in the body of the Response.

Deputy Regional Administrator and Plaintiff's supervisor on that date, so no actions by Griswold are exhausted);

(e)   Plaintiff's allegations involving the announcement and solicitation of applications for a GS-14 Public Affairs position in March 2012 (including an  email to the "Latino Network").

## B.   Adverse Employment Actions

The Tenth Circuit has "liberally define[d] the phrase 'adverse employment action,'" and takes "a case-by-case approach, examining the unique factors relevant to the situation at hand." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) and *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004)).  The Tenth Circuit determined that this standard did not change following the Supreme Court's opinion in  *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006):

> The Supreme Court most recently addressed the contours of adverse employment actions in [*Burlington*].  The Court made clear the substantive discrimination provisions of Title VII are limited "to [adverse] actions that affect employment or alter the conditions of the workplace." 126 S. Ct. at 2412. Thus, while *Burlington Northern* modified our retaliation standards for adverse actions, it had no similar effect on our discrimination jurisprudence. Accordingly, we continue to examine claims of adverse action on the basis of race or sex discrimination on a case-by-case basis, "examining the unique factors relevant to the situation at hand." *Sanchez*, 164 F.3d at 532.

*Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007).

Thus, generally, "[o]nly 'acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *C.R. England, Inc.*, 644 F.3d at 1040 (citing *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006)).  "However, the term 'adverse employment action' is not necessarily 'limited to such acts.'" *C.R. England, Inc.*, 644 F.3d at 1040 (quoting *Hillig*, 381 F.3d at 1032-33).

56

In *Hillig*, the Tenth Circuit held "an act by an employer that does more than *de minimis* harm to a plaintiff's future employment prospects can, when fully considering the unique factors relevant to the situation at hand, be regarded as an adverse employment action, even where plaintiff does not show the act precluded a particular employment prospect." *Hillig*, 381 F.3d at 1033 (internal quotations and citations omitted). Still, "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Sanchez*, 164 F.3d at 533.

Here, Defendant concedes Plaintiff's protected status and concedes Plaintiff had five adverse employment actions – all involving discipline – but not the dozens of interactions Plaintiff asserts rise to the level of adverse actions.   Docket #106 at 43.   The disciplines Defendant concedes are adverse actions are addressed in further detail in the following sections but listed here:

(a)     October 28, 2010 email counseling by Gomez.
(b)     April 4, 2011 official reprimand by Garcia for the homelessness conference registration request.
(c)     June 13, 2011 official reprimand by Garcia for incomplete assignments and improper leave.
(d)     October 27, 2011 four-day suspension by Garcia for incomplete assignments and improper leave.
(e)     March 29, 2012 removal by Garcia for the refusal of Multifamily   rotation, checking out laptop, and rude email.

Plaintiff, however, lists dozens of other actions she considers adverse actions, which Defendant appropriately categorizes as the following and the Court reviews in turn.

### 1)     Changes in Job Responsibilities Caused by a Lateral Transfer

When a lateral transfer in a job causes an alteration of job responsibilities, that is not an adverse action. *Sanchez*, 164 F.3d at 532.   The *Sanchez* court wrote: "We do not find any special

57

circumstances unique to this case to show this employment action was anything beyond a mere inconvenience or alteration of job responsibilities.  Because [plaintiff] experienced a purely lateral transfer, we agree with the district court that despite her personal discomfort, she failed to establish a prima facie case of discrimination."  *Id.*   Here, Plaintiff's supervision changed from Gomez to Goin and then back to Gomez, but Plaintiff retained the same title throughout those changes, making the transfer lateral, as was the case in *Sanchez*.  While her duties changed when working for Goin, her work with both supervisors was within the job description for the position she held for the duration of her time under their supervision.  Facts ##81, 87, 91, 106.  Plaintiff cites no law to the contrary and makes no argument as to why such changes in her responsibilities should be considered adverse.  Thus, the Court concludes they were not.

### 2)    Criticisms of Work

Plaintiff provides extensive emails and allegations that her work was criticized, yet Defendant asserts these criticisms do not equate with adverse actions.  "To the extent that [plaintiff] contends that ordinary, day-to-day criticism of her work by [defendant] constitutes a distinct employment action, she has failed to demonstrate how such criticism effected a significant change in her employment status, and thus, these ordinary criticisms do not constitute an adverse action." *Rodriguez v. Wet Ink, LLC*, No. 08-cv-00857-MSK-CBS, 2012 WL 1079006, at *8 (D. Colo. Mar. 30, 2012).  Here, similarly, Plaintiff provides no link to demonstrate how the criticism led to a significant change in her employment status, and Plaintiff cites no law or evidence to the contrary. Thus, the Court concludes the criticisms of her work were not adverse actions.

### 3)    Performance Evaluations

Plaintiff asserts that she received performance evaluations rating her "fully successful"

instead of a higher rating, yet this has not been found to be an adverse action by an employer. *Kenfield v. Colo. Dep't of Public Health & Env.*, 837 F. Supp. 2d 1232, 1238 (D. Colo. 2011).  The *Kenfield* court noted, "It is difficult to see how a performance evaluation that rates an employee as satisfactory or better – as an overall rating of 2 represents here – could amount to an adverse employment action." *Id*.  Plaintiff cites no law or evidence to the contrary and does not allege her compensation was affected by the rating.  The Court concludes her performance evaluations were not adverse actions.

### 4)     Training

Plaintiff argues she was not allowed to attend training, yet this also does not rise to an adverse employment action.  *Conlon v. City & Cnty. of Denver, Colo.*, No 11-cv-02039-RBJ-CBS, 2013 WL 143453, at *6 (D. Colo. Jan. 15, 2013).  The *Conlon* court indicated that a plaintiff who was not allowed to go to a conference did not by that act show an adverse action.  *Id*.  ("[T]his [c]ourt is not convinced that not allowing [plaintiff] to attend the conference is an adverse employment action.  An employ's act must do more than de minimus harm, and must be materially adverse to the employee's job status." (internal quotations and citations omitted)).  Like the plaintiff in *Conlon*, who failed to demonstrate that not being allowed to go to the training adversely impacted his job status, Plaintiff here has similarly not made that connection, cited law, or demonstrated evidence to allow the Court to make that link.  Thus, the Court concludes the training issues were not adverse actions.

### 5)     Elevator Time

Plaintiff asserts that her being denied 15 minutes of "elevator time" "once or twice" – time she alleges she was told she could have before and after her start and end time on any given day of

work and before and after lunch – and having to use annual leave "two or three times" to cover for her elevator time are also adverse actions. Facts ##191-92. Defendant points out that this amounts to no more than an hour and a half of dispute time during the course of years of Plaintiff's employment. Docket #106 at 46. Defendant also denies elevator time even exists at all. *Id.* However, even if it did (which Plaintiff has not produced evidence to show), the Court agrees that just a few hours of time over the course of years is not a "significant change in benefits" as the Tenth Circuit requires for that change to be considered an adverse action. *Haynes*, 456 F.3d at 1222. Plaintiff cites no law to the contrary. The Court thus concludes that her denial of elevator time does not rise to the level of adverse action.

**6)**      **SLRP Applications**

Plaintiff claims the delay in approving her SLRP applications in 2010 and 2011 are adverse actions, yet the undisputed facts show she received all of the funds for which she applied. Facts ##149, 153. Plaintiff does not provide law or evidence to the contrary. Thus, the Court concludes there was no significant change in her employment status and no materially adverse act based on the handling of Plaintiff's SLRP applications.

**C.**      **Circumstances that Give Rise to Inference of Discrimination**

The third prong of a prima facie case of discrimination, that the challenged action took place under circumstances giving rise to an inference of discrimination, may be established by a plaintiff in a number of ways, but the most common is to show that similarly situated employees were treated differently. *Hysten v. Burlington N. Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002). To show such similar conduct, a plaintiff must show the similarly situated employee "had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish

60

their conduct or the employer's treatment of them for it." *Mackenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005).  However, the Tenth Circuit also stressed that "courts must be sensitive to the myriad of ways such an inference can be created." *Id.* (internal quotations and citations omitted).  In *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005), the court listed additional evidence a plaintiff could use to show the inference, including "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," "preferential treatment given to employees outside the protected class," or "a pattern of recommending the plaintiff for positions for which she is not qualified" and "failure to surface plaintiff's name for positions for which she is well qualified." *Id.*

Here, Defendant argues Plaintiff has failed to establish that the challenged action took place under circumstances giving rise to an inference of discrimination.  Docket #106 at 46.  Plaintiff alleges that eight HUD employees were similarly situated to her [fact #209], but Defendant asserts and the Court agrees that Plaintiff provides no evidence that any of them engaged in the same conduct that led to her discipline.  Further, Plaintiff gives no other evidence satisfying the alternative mechanisms of meeting the third prong's requirements, such as remarks by decisionmakers that could be viewed as reflecting a discriminatory animus.  Plaintiff was offended by a football analogy made by Griswold [fact #254] and a fortune-cookie comment by Gomez [fact #256], but Plaintiff does not indicate how either give rise to the inference of discrimination.  Plaintiff's Response and Surreply fail to provide legal argument or evidence to the contrary.  Thus, the Court concludes Plaintiff fails to meet the third prong of her prima facie case.

### D.  Legitimate, Nondiscriminatory Reasons for Discipline, without Pretext

Defendant argues the Agency has legitimate, nondiscriminatory reasons for each discipline,

and there is no evidence of pretext.   Docket #106 at 47.   Plaintiff responds that Defendant mischaracterizes the evidence, but the Court's review of the evidence finds it to be consistent with Defendant's position regarding all five disciplines below.

### 1)   October 28, 2010 email counseling by Gomez

Plaintiff was reprimanded for sending what Gomez believed to be an inappropriate email to Regional Administrator Garcia and to a political appointee as well as her second-level supervisor, saying that Garcia had to "avoid [] temptation of giving misinformation," and that Plaintiff needed Garcia to "become better versed; confident; and comfortable" in his position.   Facts ##19-24. Gomez believed that Plaintiff's email chastised Garcia, gave him expectations, and failed to show proper deference that an employee should show.   Fact #22.   The Court finds that objectively, Gomez's belief is reasonable.   Plaintiff fails to counter this with evidence.   Thus, the Court concludes Gomez had well-documented, legitimate, nondiscriminatory reasons for the email counseling.

### 2)   April 4, 2011 official reprimand by Garcia for the homelessness conference

Garcia reprimanded Plaintiff for asking for and receiving free registration for the National Conference on Ending Family Homelessness, valued at $450, in exchange for her offering to volunteer to help at the conference.   Fact #30.   In an email Plaintiff sent to the organizer of the Conference, Plaintiff identified herself as the point of contact for HUD's homelessness program in Region VIII.   *Id*.   Gomez asked HUD's OGC about Plaintiff's actions.   *Id*.   The OGC concluded Plaintiff violated 5 C.F.R. § 2635.202(a)(1), which prohibits a federal employee from soliciting or accepting a gift from a prohibited source or given because of the employee's official position.   *Id*. HUD's General Counsel also expressed concern at Plaintiff's actions involving the Conference, as

the OGC had warned Plaintiff less than a month before in a memorandum regarding ethical advice about the use of her HUD position for personal gain or to receive preferential treatment. *Id.* Plaintiff fails to counter these facts with evidence. The Court concludes it is reasonable that government employees must be subject to ethical standards, and that HUD's OGC found that Plaintiff violated them, giving Garcia well-documented, legitimate, nondiscriminatory reasons for issuing Plaintiff an official reprimand.

### 3) June 13, 2011 official reprimand by Goin for not completing assigned duties for public event

Defendant explains that Goin issued Plaintiff an official reprimand for not completing tasks assigned to her. Docket #106 at 49. The evidence shows that Goin told Plaintiff to complete assignments to prepare Garcia for his speech at a public event, but Plaintiff did not do so and admitted she did not do so. Facts ##34-40. Plaintiff provides no evidence to counter these conclusions. Thus, the Court concludes Goin had well-documented, legitimate, nondiscriminatory reasons for issuing Plaintiff an official reprimand for not completing tasks assigned to her.

### 4) October 27, 2011 four-day suspension by Garcia for incomplete assignments and improper leave

Garcia disciplined Plaintiff with a four-day suspension for Plaintiff's noncompliance with orders, rudeness, absence without leave, and failure to follow orders. Facts ##41-47. Goin gave Plaintiff an assignment, but she did not complete it on time, and when it was finally completed, it contained errors. *Id.* Goin also gave Plaintiff the job of completing letters, but Plaintiff did not follow procedures and then did not correct her mistakes when Goin showed them to her. *Id.* Goin told Plaintiff not to email the head of FPM, Assistant Secretary Hoban-Moore, to request sick leave; instead, Plaintiff was to first ask Goin or Garcia, but she went straight to Hoban-Moore against that

directive. *Id*. Additionally, Goin had a meeting with Plaintiff at which Goin thought Plaintiff was rude, and Plaintiff left work early one day without telling her supervisor. *Id*. Each of these reasons is supported by evidence in the record, which Plaintiff does not counter with evidence. The Court concludes Garcia had well-documented, legitimate, nondiscriminatory reasons for his official reprimand of Plaintiff.

5)   <b><u>March 30, 2012 removal by Garcia for refusal of Multifamily Housing rotation, checking out laptop, and rude email</u></b>

Plaintiff had at this point four written disciplines between October 2010 to February 2012, yet she then refused to rotate into Multifamily Housing, checked out a laptop to use for the weekend after being told by her supervisor that she could not do so, and told her supervisor to issue her a charge for refusing to comply with an order. Facts ##49-50, 54, 56, 75. Gomez wanted her to do the rotation in Multifamily Housing because he thought it important for FPM Management Analysts such as Plaintiff to have such experience. Fact #49. Plaintiff refused. Fact #58. Plaintiff again fails to provide evidence to the contrary to show these facts are misconstrued. The Court concludes Garcia had well-documented, legitimate, nondiscriminatory reasons for his official removal of Plaintiff.

Therefore, the Court finds that the Defendant has shown there is no genuine dispute as to any material fact regarding the discrimination claim, Plaintiff has not provided argument or evidence showing she meets the third element of the prima facie case, and Defendant has shown it had legitimate nondiscriminatory reasons for the actions it took with no evidence from Plaintiff regarding pretext. Thus, the Court dismisses the discrimination claim.

## II.   Retaliation

The elements necessary to establish a prima facie case for retaliation claim under Title VII

are (1) the plaintiff engaged in protected opposition under Title VII, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Burlington*, 548 U.S. at 67-68. The second prong requires material adversity "because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace." *Id.* at 68 (internal quotations and citations omitted). Rather, the intent of the Title VII prohibition against retaliation is to disallow actions of employers that are likely to deter victims from reporting discrimination to their employers, the EEOC, and the courts. *Id.* at 69. The fact that an employee continues to be undeterred in pursuit of a remedy may shed light on whether the actions were sufficiently material and adverse to be actionable. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008).

## A.   **Exhaustion**

Plaintiff's retaliation claims, also based on Title VII, are limited to adverse actions that have been exhausted, in the same way her discrimination claims are limited, as discussed above. This results in her retaliation claims being limited to events occurring between August 17, 2010 (45 days before Plaintiff contacted an EEO counselor) and October 29, 2011 (when the report of investigation was issued). However, Plaintiff's removal was exhausted through the MSPB process.

## B.   **Materially Adverse Actions**

Here, the agency concedes the first prong. Regarding the second prong, Plaintiff appears to assert that the same issues listed above in the analysis of her discrimination claim also demonstrate evidence of her retaliation claim. Defendant counters that only the disciplines described above as well as the denials of Plaintiff's requests for telework are materially adverse actions. Docket #106

at 54.  Defendant argues and the Court agrees that Plaintiff's other allegations are not materially adverse.  Docket #106 at 54-55.  Plaintiff complains about changes in her duties and in her supervisors, but nothing indicates those changes were materially adverse actions.  Plaintiff also complains of a draft performance review she found on a printer around 2 a.m. on a weekend morning, but the final performance review given to her did not reflect the "unacceptable" rating she had seen on the draft.  Facts #154, 160.  Plaintiff complains about her FMLA requests, but only one was ever denied, and even that one was later approved.  Facts ##173-75.  HUD's evaluation of her training requests were reasonable.  Facts ##184-86.  Plaintiff complains she was denied "elevator time" "one or twice" and had to take annual leave for elevator time "two or three times," but that does not rise to the level of a materially adverse action.  Facts ##191-92.  Plaintiff also complains about the delay in processing her SLRP application, but she received the complete amount she requested.  Fact #260.  Also the Court agrees with Defendant that the delay could not have been in retaliation for filing her EEO complaint because the delay came before her first contact with an EEO counselor and was discussed in her EEO complaint.  *Id.*

The Court further agrees with Defendant that Plaintiff's prolific use of EEO remedies – she pursued every EEO remedy available to her – indicates she was not deterred from use of such remedies, and per *Somoza*, "shed[s] light on whether the actions were sufficiently material and adverse to be actionable."  Here, Plaintiff's remedies included: filing a formal complaint with the EEO; filing an amended complaint with the EEO; deposing five HUD employees in that case; filing an appeal of her removal to the MSPB alleging discriminatory removal; conducting three additional depositions in her MSPB case; participating in a three-day hearing before the MSPB; and filing two more EEO complaints (one against HUD and one against the Department of the Interior) after her

removal.  Facts ##270-75.   Thus the Court concludes that Plaintiff mischaracterizes these actions (as well as the smattering of other generally alleged adverse actions that Plaintiff peppers throughout her Response [*see generally* docket #137 at iv]) as materially adverse when they are not.

### C.   Legitimate, Nondiscriminatory Reasons for Each Materially Adverse Action

Regarding all of the disciplines discussed in the discrimination analysis above, the same legitimate, nondiscriminatory reasons (without evidence of pretext) apply here as well to Plaintiff's retaliation claims.   The Court is not persuaded that any of the other actions complained of by Plaintiff were not made for legitimate, nondiscriminatory reasons, including Plaintiff's changes in duties and supervisors, the denial (and later approval) of her SLRP applications, the denial of her telework requests, and her performance reviews.   Plaintiff shows no evidence to the contrary.

Thus, the Court dismisses Plaintiff's retaliation claim.

### III.   Hostile Work Environment

### A.   Exhaustion

Hostile work environment claims must be exhausted and are generally limited to events occurring in the 45 days before contact with an EEO counselor.  29 C.F.R. § 1614.105(a)(1).   A court first examines the acts in the filing period and then may consider others outside the timeframe if they are "related by type, frequency, and perpetrator."   *Duncan v. Manager, Dep't of Safety*, 397 F.3d 1330, 1309 (10th Cir. 2005).

Here, Plaintiff contacted an EEO counselor on September 30, 2010.  Fact #268.  Forty-five days prior to that date is August 16, 2010.  The Court first reviews the events in the 45 days before Plaintiff contacted the EEO counselor, per *Duncan*.  Plaintiff's EEO complaint alleges the following discriminatory acts:

(a)     Griswold not processing Plaintiff's 2010 SLRP application;

(b)     Performing duties of a GS-13 as assigned by Griswold without the title or pay;

(c)     Applying for telework but not receiving written decisions from Gomez; and

(d)     Disciplinary actions on October 28, 2010 (email admonishment) and February 9, 2011 (notice of proposal to suspend for seven days).

Document #106 at 61 (citing Ex. 40 at 15-16).

Here, the final items (d) above are clearly outside the claim as the events happened after the EEO complaint, so the Court will not consider them. The other items were exhausted by Plaintiff, so the Court next reviews, per *Duncan*, the exhausted actors (Griswold and Gomez) and their exhausted alleged discriminatory behavior (not processing her requests/applications, and being required to perform duties without the requisite title or pay). Any alleged act that was not done by those actors or behavior dissimilar to those types of actions are not to be considered here. *Duncan*, 397 F.3d at 1309 (proper consideration is to the type of act, the frequency of the act, and the perpetrator of the act). Thus, the Court will not consider for the hostile work environment claim any acts or actors that Plaintiff did not exhaust.

## B.     Discrete Acts in Discrimination Claim

The Supreme Court has explained that a plaintiff may not bring claims about discrete actions of discrimination into a generally alleged hostile work environment claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) (discrete employment decisions are distinct from non-discrete harassment that occurs over a period of time and must be separately exhausted). "*Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir.

2003) (citing *Morgan*, 536 U.S. at 110-13).  Thus, Plaintiff here cannot mix discrete acts with other acts to allege a hostile work environment.  *See e.g., Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005) ("plaintiff's alleged 'hostile' events are the very employment actions he claims are retaliatory; he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim.").

### C.        Elements of a Hostile Work Environment Claim

A plaintiff must show evidence supporting both elements of a hostile-work environment claim: (1) that she was discriminated against because of a protected ground; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.  *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012).  Evidence of the second prong must "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Serv*., 142 F.3d 1334, 1341 (10th Cir. 1993) (quotation omitted).  "Whether an environment is hostile or abusive can be determined only by looking at all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotation omitted).  Courts also must evaluate whether plaintiff was "subjected to this abusive environment because of this protected characteristic." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  A plaintiff must show that the environment was both objectively and subjectively hostile or abusive. *Morris*, 666 F.3d at 663-64.

The Supreme Court has held in the context of a hostile work environment claim based on the protected class of sex that a plaintiff has three ways to show the causal link between the alleged harassment and the protected ground: (1) explicit or implicit proposals of sexual activity motivated by sexual desires; (2) harassment motivated by general hostility toward members of one gender in the workplace; or (3) comparative evidence about a supervisor's treatment of members of each sex in a mixed-sex workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998). Further, the Tenth Circuit has held that to establish a racially hostile work environment "plaintiffs must prove more than a few isolated incidents of racial enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute. Instead, there must be a steady barrage of opprobrious racial comment. Title VII is violated only where the work environment is so heavily polluted with discrimination as to destroy the emotional and psychological stability of the minority [employee]." *Hicks v. Gates Rubber Co.*, 933 F.2d 1406, 1412 (10th Cir. 1987). A plaintiff must do more than show she worked in a stressful environment riddled with personality conflicts:

> The hostile work environment that [the plaintiff] portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world. Normal job stress does not constitute a hostile or abusive work environment. As the Seventh Circuit explained, federal law "does not guarantee a utopian workplace, or even a pleasant one. . . . [P]ersonality conflicts between employees are not the business of the federal courts." We cannot vilify every supervisor that implements a policy with which an employee disagrees or that monitors her employees' conduct. Plaintiff has not cited any cases that have found similar employer conduct to constitute a racially hostile work environment, and we decline to extend the contours of a "hostile work environment" to include Plaintiff's alleged job situation.

*Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (internal citations omitted).

70

Here, Plaintiff fails to show any evidence that the acts of which she complains were because of any protected ground and that the acts actually constituted discrimination because of that characteristic as required in *Oncale*. Even expanding the analysis beyond just the exhausted claims of Gomez and Griswold to all of the five people Plaintiff asserts discriminated against her (Griswold, Gomez, Goin, Garcia, and Gerrish), Plaintiff shows not one piece of evidence that any made explicit comments that could be shown as hostile toward her on any of her protected grounds of race, color, sex, and EEO activity. *See* facts ##254-58. For example, Plaintiff alleges that Gomez showed discriminatory animus when he gave her a fortune-cookie fortune that said, "Before you see the light, you must deal with the darkness." Fact #256. She also alleges that Griswold's making a football analogy showed racial discrimination. Fact #254. Yet, neither of those comments or the other comments Plaintiff alleges reflected racial, colorist, or sexist attitudes shows a discriminatory animus. Plaintiff does allege that Goin, in 2008, referred to a Latino male as "boy" in her presence. Fact #257. But Plaintiff does not share characteristics with the target of Goin's alleged comment – Plaintiff is not Latino, male, or the target's color – so the comment fails to demonstrate animus towards Plaintiff. None of these comments could be considered part of a hostile work environment claim or suggest that other actions by the persons who made the statements could possibly be motivated by discrimination.

Similarly, while Plaintiff alleges eight employees (Cabrera, Russell, Hernandez, Baumann, Zvonkovic, Graver, Brey, and Eggleston) were similarly situated [*see* fact #209], Plaintiff fails to show evidence that they were in fact similarly situated – alike in all relevant ways but for the protected ground at issue. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1120, 1232 (10th Cir. 2000). There, the Tenth Circuit held that "[a]n employee is similarly situated to the plaintiff

if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline. A court should also compare the relevant employment circumstances, such as work history and company policies applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Id.* (internal quotation and citations omitted). Various differences between a plaintiff and others can prevent them from being considered similarly situated. *See, e.g.*, *Nieto v. L&H Packing Co.*, 108 F.3d 621, 623 (5th Cir. 1997) (where plaintiff had a prior disciplinary history and alleged comparator did not, they were not similarly situated); *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (employees were not similarly situated when one had four years more experience than the other).

Plaintiff's alleged comparators are different from her. Most importantly, not one has Plaintiff's history of discipline. *See* facts ##213, 223, 227, 231, 241, 246, 251. In contrast, Plaintiff received five disciplines in writing in an 18-month period, ending with her ultimate removal. While Plaintiff worked for HUD for about four years, for FPM for about two years, and had limited other experience with the federal government, her alleged comparators had worked for FPM, HUD and the federal government for extensive periods of time. *See* facts ##2-3, 211-212, 20, 226, 236, 240, 245, 248. Plaintiff also had different duties and different GS-levels from her alleged comparators. *See* facts ##13, 218, 224, 243.

Thus, Plaintiff fails to meet the first prong of a hostile work environment claim – that she was discriminated against because of a protected ground. Even if she could demonstrate the first prong, Plaintiff fails to establish the second – that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment. *See Morris*, 666 F.3d at 663. The Court here considers the totality of the

circumstances and considers such factors as "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morris*, 666 F.3d at 664 (citation omitted).   A few isolated incidents – unless egregious, such as sexual assault – are not enough to be pervasive.   *Id.* at 666-67.   The Court agrees with Defendant's characterization of the workplace environment: "Plaintiff's allegations amount to no more than managers trying to get her to do her job.   That is not harassment."   Docket #106 at 70.   Plaintiff fails to provide evidence that there existed any discriminatory conduct, let alone that it was pervasive or severe, thus the Court dismisses her hostile work environment claim.

## IV.   FLSA

Under the FLSA, a two-year statute of limitations applies to overtime claims unless a violation is willful, in which case a three-year statute of limitation applies.   29 U.S.C. § 255(a). Defendant contends the two-year statute of limitations applies to Plaintiff's claims because she cannot produce evidence of willfulness.   Docket #106 at 72.   An action is "willful" if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."   *Mumby v. Pure Energy Serv. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).   "Reckless disregard can be shown through 'action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"   *Id*. (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)); *see also Reich v. Monfort, Inc.*, 144 F.3d 1329, 1334 (10th Cir. 1998) (the standard for determining whether a violation of the FLSA is willful, knowing or reckless "is whether the employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]'") (quoting

*McLaughlin*, 486 U.S. at 133 (1988)). "The employee has the burden of proving the employer acted willfully." *McLaughlin*, 486 U.S. at 135.

Plaintiff filed her Complaint on June 18, 2014, so the statue of limitations ran for all claims accruing before June 18, 2012 [*see* fact #276]. Thus, all her FLSA claims are outside the two-year statute of limitations, so Plaintiff must show willfulness, which she fails to do. Thus, the Court dismisses Plaintiff's FLMA claims.

## V. FOIA

In response to a FOIA request, a government agency must make a "reasonable" search, but such searches are not required to be exhaustive. *Daly v. FBI*, No. 09-cv-01722-PAB-BNB, 2011 WL 588046, at *4 (D. Colo. Jan. 7, 2011). Agencies also have several exemptions under which materials are not to be disclosed. *See* 5 U.S.C. § 552(b). Exemption 6 of FOIA protects information about individuals in "personnel and medical files and similar files" when such disclosure would "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Similar files" has been held by the Supreme Court to include all information that "applies to a particular individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). Information need not be intimate or embarrassing to qualify for Exemption 6 protection. *Id*. at 600. Government employees also have a privacy interest regarding information about their misconduct. *See, e.g.*, *Trentadue v. Integrity Comm'n*, 501 F.3d 1215, 1233 (10th Cir. 2007). In considering the application of Exemption 6, courts balance the privacy interest of the persons whose information would be released versus the public interest the requestors show. *See, e.g.*, *Sheet Metal Workers Intern. Ass'n Local No. 9 v. U.S. Air Force*, 63 F.3d 994, 997 (10th Cir. 1995).

Meanwhile, Exemption 5 protects "inter-agency or intra-agency memorandums or letters

which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This protects from disclosure documents that would be privileged in the context of civil discovery. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Exemption 5 also protects from disclosure documents protected by the deliberative-process privilege, such as materials that show agency decisionmaking and thoughts of decisionmakers prior to taking action. *Dept. of Interior v. Klamath Water Users Protective Ass'n*, 531 U.S. 1, 8 (2001). Materials protected by this privilege must be "deliberative" and "predecisional." *Trentadue*, 501 F.3d at 1227. The protection is for attorney-client communications but also extends to those involved in the "process by which governmental decisions and policies are formulated." *Klamath*, 532 U.S. at 8; *see also Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981).

Additionally, exhaustion of administrative remedies for FOIA requests is required before seeking judicial review. *Trenerry v. IRS*, No. 95-5150, 78 F.3d 598, 1996 WL 88459, at *1 (10th Cir. 1996) ("[T]he district court lacked subject matter jurisdiction over this [FOIA] action where plaintiff has failed to exhaust her administrative remedies.") Exhaustion of remedies requires a complainant requesting specific information in accordance with published administrative procedures and then appealing any improperly refused request to the agency's head. 5 U.S.C. § 552 (a)(3).

Here, Plaintiff did not exhaust her administrative remedies regarding FOIA Requests 12-FI-R08-01178 or 12-FI-R08-01228. The agency responded to those Requests. Facts ##308, 319. She was told she could appeal, but she did not. Facts ##309, 320. Therefore, Plaintiff did not exhaust her administrative remedies regarding those two Requests, and this Court lacks jurisdiction over them.

Furthermore, based on Exemption 6, the agency withheld all disciplinary information

75

requested for Region VIII, where Plaintiff worked, because of Plaintiff's knowledge of the specific employees with whom she could have had familiarity, thus redacting names and other information would not have reasonably protected identities.  Docket #108 at 19.  For information outside Region VIII, the agency merely redacted names, positions and offices but otherwise provided the information to Plaintiff.   *Id*. at 19-20.   Based on Exemption 5, the agency withheld documents Plaintiff requested that involved "confidential communications between management officials, the [human resources ("HR")] specialist, and agency attorneys in which legal advice regarding Plaintiff was either sought or given."  Docket #108 at 21; *see also* fact #291(b).  Also based on Exemption 5, the agency withheld documents Plaintiff requested that involved "pre-decisional deliberative communications between management officials and the HR specialist pertaining to advice and guidance related to Plaintiff's discipline."  Docket #108 at 20; *see also* fact #291(a).

Plaintiff has made no argument to show a public interest in the release of the exempt documents, while the agency has shown its employees have a privacy interest in their disciplinary history.  Further, the Agency appears to have made a reasonable search in response to all of Plaintiff's FOIA Requests.   Where delay occurred, the Agency has now fully responded to Plaintiff's FOIA Requests, so any timeliness claim is moot.  *Info. Network for Responsible Mining v. Dep't of Energy*, No. 06-cv-02271-REB-CBS, 2007 WL 762248, at *2 (D. Colo. Mar. 18, 2008) ("now that the defendant has proffered its final administrative response to the request and has produced documents it believes to be fully responsive, however, plaintiffs' timeliness claim is moot.")  Thus, the Court dismisses Plaintiff's FOIA claims.

## **CONCLUSION**

Accordingly, Defendant's Motion for Summary Judgment [filed March 31, 2015; docket

76

#106] and Defendant's Motion for Summary Judgment Regarding Plaintiff's FOIA Claim [filed April 21, 2015; docket #108] are **granted**.  The case is **dismissed with prejudice**, and **costs shall be awarded** in accordance with Fed. R. Civ. P. 54 and D.C. Colo. LCivR 54.1.

Entered and dated at Denver, Colorado, this 16th day of November, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

77